U.S. BANK N. A., et al., Appellants,

v.

COLD SPRING GRANITE COMPANY, et al., Respondents,

and

Patrick D. Alexander, Respondent.

No. A10–0252.

Supreme Court of Minnesota.

Sept. 7, 2011.

Peter J. Gleekel, Craig S. Krummen, Winthrop & Weinstine, P.A., Minneapolis, MN, for appellants.

William Z. Pentelovitch, Wayne S. Moskowitz, Martin S. Fallon, Maslon, Edelman, Borman & Brand, LLP, Minneapolis, MN, for respondents Cold Spring Granite Company, et al.

Joseph W. Anthony, Cheryl A. Stanton, Anthony Ostlund Baer & Louwagie, P.A., Minneapolis, MN, for respondent Patrick D. Alexander.

## OPINION

ANDERSON, G. Barry, Justice.

This case arises out of a reverse stock split in which minority shareholders were forced to accept cash in exchange for their shares. Thomas Moore, Ann McCabe, and U.S. Bank (Moores) are trustees of eight appellant family trusts (Moore Trusts) that brought suit against respondent Cold Spring Granite Company (CSG) and its chairman and CEO respondent Patrick D. Alexander after CSG stock belonging to the trusts was fractionalized in a reverse stock split and redeemed for cash at a price determined by CSG's board of directors (Board). The district court appointed a special master who conducted a bench trial and issued recommended findings of fact and conclusions of law. After the trial, the court accepted the special master's recommendations and dismissed all of the Moores' claims. The court of appeals affirmed, and we granted the Moores' petition for review of the decision of the court of appeals and now affirm.

The Cold Spring Granite Company, a Minnesota corporation, has been in the granite business since 1898. Respondent Patrick D. Alexander has been CSG's CEO since 1983 and the chairman of the Board since 1997. Alexander is also a shareholder of CSG. Appellants Thomas Moore, his sister Ann McCabe, and U.S. Bank are trustees, in varying combinations, of eight family trusts, all of which owned CSG stock until the reverse stock split at issue in this case.

*Capitalization of CSG*

CSG has three types of stock: preferred, Class B common, and Class A common. Preferred shares do not have voting rights, but are entitled to annual dividends. Common shares do not receive dividends, but have voting rights (100 votes per Class B share and one vote per Class A share). Before the reverse stock split at issue, there were 151,396 shares of preferred stock outstanding, which were held by more than 300 shareholders. There were 70 shares of Class B common stock outstanding, all of which Alexander owned. Finally, there were 76,890 shares

of Class A common stock. Alexander and the Alexander Family Trust, of which Alexander was trustee, together owned approximately 93% of the Class A common stock. The Moore Trusts collectively owned 5,067 shares, or 6.58% of the Class A common stock.

*Alexander's Previous Offers to the Moores*

After Alexander became CEO in 1983, he made several attempts to acquire all minority holdings of CSG stock. In 1985 the company offered to convert its common stock to preferred stock. The vast majority of shareholders accepted this offer. But the mother of Moore and McCabe, then trustee of the Moore Trusts, rejected the offer, believing the conversion value of the common stock was too low. Alexander also attempted to purchase the Moores' stock in 1990 and 1998; his offers were again rejected.

*Kahlert Litigation*

In May 2005, two other minority shareholders of CSG, John Kahlert and James Kahlert (Kahlerts), filed a derivative action on behalf of CSG against CSG's management, alleging breaches of fiduciary duty. Ann McCabe submitted an affidavit in support of the Kahlerts expressing concern that CSG was profitable but had not paid dividends. The district court dismissed the Kahlerts' action.

Despite its dismissal, the Kahlerts' litigation sparked additional efforts by Alexander to buy out CSG's minority shareholders. In January 2006, counsel for CSG advised the Board at a special meeting that minority shareholders of CSG could be removed for the cash value of their shares by effecting a reverse stock split, to be followed by redemption of resulting fractional shares for cash. Counsel further advised the Board that, unlike a cash-out merger, a reverse stock split would not require a shareholder vote and would not give shareholders the right to

judicial determination of the fair value of their shares. To avoid fractionalization of the Alexander family's holdings, CSG's counsel recommended that the shares held by Alexander personally be combined with those held by the Alexander Trust into a newly formed holding company.

The Board discussed appraisals of the company to determine how much the Class A common shares were worth. CSG had been appraised several times since 1994 for unrelated purposes. Also, by this time, Alexander and other members of CSG's management had already begun to arrange for the appraisals of the company necessary for the purpose of removing minority shareholders. The various appraisals of CSG that had been done over the years are as follows.

*Appraisals of CSG*

Between 1994 and 2001, Piper Jaffray and U.S. Bank conducted a number of valuations of CSG. The valuations varied widely, from a low value of $13.8 million in 1994 and reaching a high value of $94.5 million in 1999. By 2001, U.S. Bank valued the company at $35 million. Additionally, CSG management personnel undertook a number of valuations of CSG between 2004 and 2005. In October 2004, Chief Financial Officer Greg Flint created a spreadsheet of possible valuations of CSG in order to understand how much money the company might need to pursue a redemption of minority shareholders. The valuations ranged from $77 million to $209 million, and were labeled "A" through "D". Flint testified that Alexander and the CSG board told him that the "A" projection was "too pessimistic." Accordingly, Flint prepared three versions titled "B" through "D," based on aspirational sales projections. Flint also prepared a valuation entitled "D–1," based on version "D" on June 23, 2005. This version valued CSG at $142 million, again,

based on aspirational sales figures. As it happened, CSG did not meet even the sales figures used in the version "A" projection, and all of Flint's valuations appear to have been overly optimistic compared with the subsequent financial performance of CSG. This variation was due to CSG's financial troubles. In 2003, CSG adopted an aggressive growth strategy, which involved opening residential countertop stores across the nation. By 2005 this strategy had failed, and CSG had begun making cost-cutting measures.

On June 23, 2005, CSG board member Patrick Mitchell, who is not a trained appraiser, prepared a handwritten valuation in connection with preparations to eliminate minority shareholdings. Mitchell valued the company at a range from $74.3 million to $162.7 million. Finally, CSG prepared three budgets for 2006 to be given to U.S. Bank, based on three different scenarios with respect to a buyout of minority shares. These budgets did not undertake to value CSG as a whole.

The Kahlerts commissioned an appraisal of CSG from Schmidt Financial in connection with their lawsuit. The Schmidt report was dated February 10, 2005, and valued CSG at $246.7 million as of December 31, 2004. Schmidt relied heavily on management-provided financial analyses. CSG hired Arthur Cobb, a CPA with over 30 years of litigation appraisal experience, to critique the Schmidt report. Cobb's critique report concluded that the Schmidt report was "a superficial, mathematical exercise, apparently designed to compute an extreme overstated estimate of value."

Cobb also conducted an independent appraisal of CSG. Cobb's appraisal report valued CSG at $85 million as of December 31, 2005. Cobb considered three valuation approaches: the market approach, the income approach, and the net asset value approach. Cobb rejected a final determi-

nation based on the market approach, concluding that there were no businesses sufficiently comparable to CSG to yield an accurate determination of CSG's value. Cobb then valued CSG using the income approach and the asset approach. Using the asset approach, Cobb valued the non-operating investment land separately from the granite operations. He valued the non-operating land at $20 million, because it was producing no income. Cobb then valued the granite operations using the income approach at $37–40 million, and using the asset approach at approximately $57 million. Because Cobb concluded that the asset value should establish the minimum value of the company, and the asset value was higher than the income value, he adopted the asset value in his final valuation. Finally, Cobb added $5 million in equity investments to reach his final total of approximately $85 million.

In December 2005, CSG retained Jason Vavra of Chartwell Financial to prepare an opinion comparing the Schmidt report with Cobb's critique report and appraisal report. Vavra concluded that Cobb's value was closer to the "average" value established by a range of possible values based on historical performance of CSG. Vavra concluded that Cobb's appraisal was more reasonable than the Schmidt appraisal.

The Moores later retained Neil Lapidus to value CSG for litigation purposes. Lapidus did not consider or include the value of the non-operating real estate. Lapidus valued the company at $218 million at the end of 2005 using the market approach, and at $131.37 million using the discounted cash flow method. Like Schmidt, Lapidus relied on Greg Flint's sales projections.

*The Reverse Stock Split*

On January 30, 2006, the Board met and prepared to carry out the reverse stock split. Before passing the resolutions necessary to effect the split, the Board consid-

ered the various valuations of CSG. Cobb, who was present at the meeting, presented his findings on the value of CSG. Jason Vavra then discussed the differences between the Cobb reports and the Schmidt report. At this point, all interested directors, including Alexander, left the room, and the remaining directors discussed the differences between the Cobb reports and the Vavra report. They noted that Schmidt's report assumed that the company would achieve sales targets that it had not, in fact, achieved. The Board accepted Cobb's valuation of CSG.

The Board reconvened the next day, and took the necessary action to effect the split. First, the Board combined all Class A common stock at a rate of 1 for 7,132.23 shares. This was the number necessary to reduce the number of shares owned by Alexander and the Alexander Trust and contained in the holding company to exactly ten. All other outstanding share holdings were reduced to fractional shares. The board then redeemed these fractional shares for cash at a price of $986.50 per share. As a result, all minority shareholders of CSG—most significantly, the Moore Trusts—ceased to be shareholders of CSG.

On February 6, 2006, Alexander sent a letter to Moore informing him that "shareholders who owned less than 7132.23 shares of stock have had their stock redeemed as a result of owning fractional shares." The letter invited the Moores to tender their shares to U.S. Bank for payment of their value as determined by the Board.

*Litigation*

The Moores commenced this action, alleging: (1) breach of fiduciary duty; (2) violation of Minn.Stat. § 302A.751 (2010)[1];

(3) violation of shareholder and dissenter/appraisal rights; (4) violation of the Uniform Fraudulent Transfer Act; (5) promissory estoppel; and (6) fraud. The case was heard before a special master, who recommended that the Moores' action be dismissed. The district court made a de novo review of the challenged portions of the special master's findings of fact and all of the conclusions of law, and adopted the special master's findings of fact and conclusions of law in their entirety.

The district court concluded that the reverse stock split was validly undertaken and shareholder approval was not required. The district court characterized the "fair value" of the common shares at $1,142.92 per share, but concluded that the disparity between the district court's finding of fair value was not so different from the Board's finding of fair value as to suggest fraud. The court concluded that the Board's decision to use Cobb's valuation was not the product of fraud, and did not give rise to dissenters' rights under Minn. Stat § 302A.471 (2010), nor a court-supervised valuation proceeding under Minn.Stat. § 302A.751. Finally, the court found that the Moores had failed to prove a violation of the Uniform Fraudulent Transfer Act, and also failed to establish grounds for promissory estoppel.

The Moores appealed to the court of appeals. *U.S. Bank N.A. v. Cold Spring Granite Co., (CSG)*, 788 N.W.2d 160 (Minn.App.2010). The court of appeals affirmed. *Id.* at 169. The court of appeals agreed that the reverse stock split was permissible and that the Board's valuation was not fraudulent, and was therefore conclusive under Minn.Stat. § 302A.423 (2010).[2] *CSG*, 788 N.W.2d at 165. The court of appeals also concluded that the

---

**1.** Allowing judicial intervention to protect shareholders.

**2.** *See* Minn.Stat. § 302A.423 (stating that a board determination of the value of fractional shares is conclusive absent fraud).

district court did not err by denying the Moores' request for dissenters' rights under Minn.Stat. § 302A.471.[3] *CSG*, 788 N.W.2d at 166. The court of appeals noted its discomfort at the different treatment of shareholders squeezed out in a reverse stock split, compared with those squeezed out in other methods of eliminating minority interests, but concluded that it was bound to apply the law as written. *Id.* The court of appeals concluded that the district court was wrong to decide that the judicial intervention statute, Minn.Stat. § 302A.751 (2010), was inconsistent with section 302A.423, which provides that the Board's determination of the value of fractional shares is conclusive absent fraud. *CSG*, 788 N.W.2d at 167. But the court concluded that there had been no violation of section 302A.751 in any case. *CSG*, 788 N.W.2d at 167–69. The concurrence emphasized "the broad remedial powers available to the district courts under Minn.Stat. § 302A.751." *CSG*, 788 N.W.2d at 169 (Lansing, J., concurring). We granted the Moores' petition for review of the decision of the court of appeals.

There are six issues before us on review: (1) was the Board's determination of the value of fractional shares the product of fraud; (2) are dissenter's rights available when a corporation pays cash for shares fractionalized in a reverse stock split; (3) was the Board's conduct unfairly prejudicial under Minn.Stat. § 302A.751; (4) did the Board breach a common law fiduciary duty; (5) was Cobb's valuation method flawed as a matter of law; and (6) are the Moores entitled to interest, fees, and costs?

■ Because the Moores did not move for a new trial, our review of the facts is limited to determining whether the evidence sustains the findings of fact, and whether the findings sustain the conclusions of law and the judgment. *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976); *Meiners v. Kennedy*, 221 Minn. 6, 8, 20 N.W.2d 539, 540 (1945); *Potvin v. Potvin*, 177 Minn. 53, 54, 224 N.W. 461, 462 (1929). But we may freely review substantive questions of law properly raised before the district court. *Alpha Real Estate Co. of Rochester v. Delta Dental Plan*, 664 N.W.2d 303, 310 (Minn.2003).

■ Under Minn. R. Civ. P. 52.01 we may not set aside "[f]indings of fact, whether based on oral or documentary evidence, . . . unless clearly erroneous." "The findings of a referee, to the extent adopted by the court, shall be considered as the findings of the court." *Id.* We have said: "If there is reasonable evidence to support the [district] court's findings of fact, a reviewing court should not disturb those findings." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999). We do not defer to the district court on questions of law. *Frost–Benco Electric Ass'n v. Minn. Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

## I.

■ The first issue before us is the Moores' challenge to the Board's determination of the value of the Moores' shares. The procedure used by CSG to eliminate the Moores' ownership of CSG stock consisted of two steps, governed by two different provisions of Minn.Stat. ch. 302A (2010). The first step of the transaction at issue, the initial share combination, or reverse stock split, which resulted in one new share being given in exchange for every 7,132.23 old shares was authorized by Minn.Stat. § 302A.402, which provides,

---

**3.** Minn.Stat. § 302A.471 (2010) enumerates situations in which a shareholder has the right to a court determination of the fair value of their shares.

"A corporation may effect a ... combination of its shares...." A corporation may carry out a reverse stock split without a shareholder vote if the combination will not adversely affect the rights or preferences of any class of shares, and if the reverse stock split does not result in an increase in the percentage of authorized but unissued shares. *Id.* Neither of these limitations applies here, and thus the Board had the authority to carry out the reverse stock split without a shareholder vote in this case.

The second step of the transaction at issue, the exchange of the fractional shares resulting from the reverse stock split for cash, was authorized by Minn.Stat. § 302A.423, which provides: "A corporation may issue fractions of a share.... If it does not issue fractions of a share, it shall in connection with an original issuance of shares ... (b) pay in money the fair value of fractions of a share as of the time when persons entitled to receive the fractions are determined...." The use of this procedure to cash out minority shares is limited by Minn.Stat. § 302A.423, subd. 2, which provides: "A corporation shall not pay money for fractional shares if that action would result in the cancellation of more than 20 percent of the outstanding shares of a class or series." This prohibition protects shareholders against "excessive abuse of the power granted by subdivision 1(b)" to cash out fractional shares. *See* Minn.Stat. Ann. § 302A.423 (West 2011), reporters notes–1981. The reverse stock split at issue resulted in the cancellation of less than 7% of CSG's common shares, and therefore, the 20% limitation is not applicable in this case. As a result of this two-step procedure, a minority shareholder ceases to be a shareholder in the corporation.

There is broad consensus that a reverse stock split may validly be used for the sole purpose of removing minority shareholders, subject to the restriction that the removal of the minority shareholders must not constitute a breach of fiduciary duty on the part of the majority shareholders or directors of the corporation. *See, e.g., Laird v. I.C.C.,* 691 F.2d 147, 151 (3d Cir.1982) (finding that a reverse stock split is legal under Missouri law); *Goldman v. Union Bank & Trust,* 765 P.2d 638 (Colo. App.1988) (deciding that the Colorado Corporation Code authorized a reverse stock split that 'froze out' minority stockholders); *FGS Enters., Inc. v. Shimala,* 625 N.E.2d 1226 (Ind.1993) (ruling that the Indiana General Corporation Act permits reverse stock splits in which corporation acquired fractional shares); *Lerner v. Lerner Corp.,* 132 Md.App. 32, 750 A.2d 709, 719 (Md.Ct.Spec.App.2000); *see also* Elliot M. Kaplan & David B. Young, *Corporate 'Eminent Domain': Stock Redemption and Reverse Stock Splits,* 57 UMKC L.Rev. 67, 74 (1988) ("No jurisdiction has any per se rule against squeeze-outs by means of reverse stock splits or otherwise...."). It is clear that the use of a reverse stock split to redeem minority shareholder interests is a powerful weapon in the majority shareholder's arsenal, particularly where, as in the Minnesota statutory scheme, neither the administration of the reverse stock split nor the valuation process is subject to contemporary judicial supervision. While the fairness of this approach is open to debate, these policy decisions are within the province of the Legislature.

■ Under Minn.Stat. § 302A.423, subd. 1(b), the price paid for fractionalized shares must be their "fair value ... as of the time when persons entitled to receive the fractions are determined." Minn.Stat. § 302A.423, subd. 2, provides that "[a] determination by the board of the fair value of fractions of a share is conclusive in the

absence of fraud." The first issue before us is what the term "fraud" means in the context of Minn.Stat. § 302A.423. The Moores argue that the meaning of fraud is best determined by the decision of the court of appeals in *Sifferle v. Micom Corp.*, 384 N.W.2d 503, 507 (Minn.App.1986), *rev. denied* (Minn. June 13, 1986). CSG does not concede that *Sifferle* fraud is applicable here, but argues that even if it is, the Moores have failed to establish even the broader definition of fraud outlined by the court of appeals in *Sifferle*.

The term "fraud" is not defined in Minn. Stat. ch. 302A. But under Minn.Stat. § 645.08(1) (2010), "words and phrases are construed according to the rules of grammar and according to their common and approved usage." We have said that "when the legislature uses a phrase we assume the legislature is aware of the common law understanding of the phrase and that the legislature intended to use the phrase according to its commonly understood meaning." *Gassler v. State*, 787 N.W.2d 575, 586 (Minn.2010); *In re Welfare of D.D.S.*, 396 N.W.2d 831, 832 (Minn. 1986). Our court has established the common law meaning of fraud in several cases. *See, e.g., Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 747 (Minn.2000); *Davis v. Re–Trac Mfg. Corp.*, 276 Minn. 116, 149 N.W.2d 37 (1967); *Vandeputte v. Soderholm*, 298 Minn. 505, 507–508, 216 N.W.2d 144, 146–47 (1974). Under *Gassler*, 787 N.W.2d at 586, we assume that the Legislature was aware of our definitions of common law fraud when it enacted the relevant language of Minn.Stat. § 302A.423 in 1981. *See* Act of May 27, 1981, ch. 270, § 62, 1981 Minn. Laws 1141, 1180–81 (codified at Minn.Stat. § 302A.423 (2010)). Therefore, we conclude that when the Legislature used the term "fraud" in Minn.Stat. § 302A.423 it was referring to common law fraud. *See* Minn.Stat. § 645.17(4) (2010).

The Moores argue that the definition of fraud used by the court of appeals in *Sifferle*, 384 N.W.2d at 507, is preferable. In *Sifferle*, a minority shareholder sought to put aside a cash-out merger that eliminated his minority shareholder interest. *Id.* at 505. The district court declined to set aside the merger, concluding in the absence of fraud, the minority shareholder's only remedy was to assert his dissenter's rights under Minn.Stat. § 302A.471 (2010) and receive fair value for his shares. *Sifferle*, 384 N.W.2d at 505. The district court concluded that the minority shareholder had failed to establish fraudulent conduct under the common law standard. *Id.* at 509. The court of appeals, examining the reporter's notes to Minn.Stat. § 302A.471, concluded that "the Minnesota legislature intended the term "fraudulent" in § 302A.471, subd. 4, to be construed more broadly than strict common-law fraud." *Sifferle*, 384 N.W.2d at 507. Specifically, the court said:

> [I]f a complaint pleads with specificity that a merger was carried out through deception, misrepresentation, actual fraud, or in violation of applicable statutes or articles of incorporation, or in violation of a fiduciary duty, it should not be dismissed for failure to state a claim

*Id.*

The Legislature has not specifically adopted the *Sifferle* definition of fraud. Moreover, the basis for the court of appeals' holding is the language of the reporter's notes regarding Minn.Stat. § 302A.471, not the statute at issue here, Minn.Stat. § 302A.423. Specifically, the court of appeals noted that, when discussing the scope of the term "fraudulent," the reporter's notes used the following language:

However, the fact that shareholders can get paid off does not justify the corporation in proceeding *unlawfully or fraudulently.* If the corporation attempts to carry through an action in violation of the corporation law on voting, in violation of charter clauses prohibiting it, by deception of shareholders or in violation of a fiduciary duty the court's freedom to intervene is unaffected.

*Sifferle,* 384 N.W.2d at 507 (emphasis added) (citing Minn.Stat. Ann. § 302A.471 (West 2011) reporter's notes—1981). The language on which the court of appeals relied in *Sifferle* is limited to Minn.Stat. § 302A.471 and we see no reason to extend it to Minn.Stat. § 302A.423.[4]

▆▆▆ Having concluded that the common law definition of fraud applies to a claim under section 302A.423, we consider whether the Moores have established common law fraud in this case. To establish common law fraud, the Moores must prove: (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce action in reliance thereon; (4) that the representation caused action in reliance thereon; and (5) pecuniary damages as a result of the reliance. *Martens,* 616 N.W.2d at 747. Fraud may also be established by concealment of the truth. *Estate of Jones v. Kvamme,* 449 N.W.2d 428, 431 (Minn. 1989).

The district court concluded that the Moores failed to prove by a preponderance of the evidence that the Board's decision to use a value of $85 million for the entire company was the product of common law fraud. *CSG,* 788 N.W.2d at 163. The Moores allege that CSG's concealment of management financial projections and misrepresentation of the true value of granite rights in Texas owned by CSG constituted fraud.

We have said that only *material* misrepresentation or concealment can support a claim for fraud. For example, in *Richfield Bank & Trust Co. v. Sjogren* we said,

> if a party *conceals* a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated.

309 Minn. 362, 365, 244 N.W.2d 648, 650 (1976) (emphasis added) (citing *Thomas v. Murphy,* 87 Minn. 358, 361, 91 N.W. 1097, 1098 (1902)).

The Moores have failed to prove that any management projections were intentionally concealed from Cobb, the individual appraising CSG's common stock or the Board. Moreover, Cobb testified that he would not have relied on management financial projections or on CSG's representations of the value of CSG's Texas granite rights even if that information had been

---

4. We are mindful of the fact that our decision today results in the presence of two interpretations of the term "fraud" in Minn.Stat. ch. 302A. Under normal circumstances, this asymmetry would weigh in favor of altering the competing definition, or reaching a different result. *Cf. Akers v. Akers,* 233 Minn. 133, 141, 46 N.W.2d 87, 92 (1951) (holding that the same word used in different subdivisions of the same statute must be given the same meaning). The continued validity of *Sifferle* is not before us, and we reach no opinion on that issue. Whether or not *Sifferle* is correct in context, the rationale for its broad definition of fraud is simply inapplicable here. Therefore, despite the asymmetry that results from our interpretation, we are limited to construing the words before us. Any rationalization of the statutory scheme must be done by the Legislature.

available to him. Therefore, any concealed information was not material.

Cobb further testified that he did not rely on Flint's projections because they assumed growth on the part of CSG that would have been very difficult to achieve, and the projections therefore would not have been relied upon by any willing buyer. Cobb also testified that he would not have relied on Mitchell's handwritten valuation.

The testimony of Flint and Mitchell confirms Cobb's testimony. Flint testified that after management criticized his original projections as "too pessimistic," he "pulled a number out of the air," in an attempt to reach a higher value than that reached in his version "A." Mitchell testified that the assumptions used in version "D" were internally inconsistent, because version "D" relied on growing profits while reducing capital expenditure. Mitchell also testified that he was not a trained appraiser, or a good valuer of properties, and that he adopted Cobb's valuation in preference to his own. Finally, there was sufficient evidence to support the finding that CSG's 2006 budget sent to U.S. Bank was immaterial. The budget was not prepared to determine fair value of the company, and employed conservative assumptions.

With respect to the valuation of Texas granite rights owned by CSG, there is sufficient evidence to support the district court's finding that the granite rights had minimal value. The granite rights standing alone generated no income for the company, were unlikely to generate income in the future, and were not marketable. Therefore, there is sufficient evidence that the granite rights had minimal value.

The misconduct that the Moores complain of—the withholding of information by management—even if intentional, was irrelevant to the Board's determination of value. Therefore, any misrepresentation was immaterial, and did not constitute common law fraud. We hold that the Board's valuation of CSG was not the product of common law fraud.

## II.

■ The second issue before us is whether, regardless of the validity of the Board's determination of the value of the Moores' fractionalized shares, the Moores are entitled to dissent from the reverse stock split and have a court, rather than CSG's board, determine the value of their shares. The district court concluded that dissenters' rights are not available for a reverse stock split under Minn.Stat. § 302A.471, and the court of appeals agreed. *CSG*, 788 N.W.2d at 167.

Dissenters' rights in Minnesota are governed by Minn.Stat. § 302A.471. Subdivision 1 lists the situations in which dissenters' rights apply. First, and most significantly, dissenters' rights arise from:

(a) unless otherwise provided in the articles, an amendment of the articles that materially and adversely affects the rights or preferences of the shares of the dissenting shareholder in that it:

. . .

(2) creates, alters, or abolishes a right in respect of the redemption of the shares . . .;

. . .

(4) excludes or limits the right of a shareholder to vote on a matter, . . .; or

(5) eliminates the right to obtain payment under this subdivision. . . .

Minn.Stat. § 302A.471, subd. 1.[5]

Minnesota Statutes § 302A.471 is intended to "enable shareholders to liquidate

---

**5.** Section 302A.471 lists five other situations

in which shareholders may, with certain ex-

their equity investment in the corporation for its fair cash value" in the event of certain fundamental corporate changes. John H. Matheson & Philip S. Garon, *Corporation Law & Practice* § 7.22 (2d ed.2004). Although Minnesota's dissenters' rights provisions are "among the most liberal," they do not explicitly provide for dissenters' rights when fractionalized shares are cashed out pursuant to Minn. Stat. §§ 302A.402 and 302A.423. Matheson & Garon, *supra* § 7.22.

█ The Moores nevertheless argue that the redemption of fractionalized shares does entitle them to dissenters' rights in this situation. The Moores argue that the reverse stock split constituted an amendment of the articles that materially and adversely affects the rights or preferences of the shares of the dissenting shareholder in that it: (1) creates, alters, or abolishes a right in respect of the redemption of the shares; (2) excludes or limits the right of a shareholder to vote on a matter; and (3) eliminates the right to obtain payment under this subdivision. *See* Minn.Stat. § 302A.471, subd. 1.

This issue presents a question of statutory interpretation. When construing statutes, we attempt "to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2010). Under Minn. Stat. § 645.16, "[w]hen the words of a law

in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit."

The language of Minn.Stat. § 302A.471, subd. 1, taken in isolation, could be interpreted to provide for dissenters' rights after a reverse stock split. But such an interpretation would render § 302A.471, subd. 1, in conflict with the more specific statutory provision in Minn.Stat. § 302A.423, which makes a determination by the board of directors of the fair value of fractionalized shares conclusive in the absence of fraud. Under Minn.Stat. § 645.16, "[e]very law shall be construed, if possible, to give effect to all of its provisions." *See also* Minn.Stat. § 645.26 (2010) (providing that when a specific provision conflicts with a general provision, the specific provision prevails). If we were to conclude that a shareholder was entitled to a judicial valuation under Minn. Stat. § 302A.471 in the event of a reverse stock split, the conclusivity provision of section 302A.423, subdivision 2, would be rendered ineffective. The determination by a board of directors of fair value would *not* be conclusive in the absence of fraud-it would only be conclusive in the absence of a desire by a cashed-out shareholder to exercise dissenters' rights under Minn. Stat. § 302A.471.[6] Therefore, we conclude

ceptions, dissent and obtain payment for the fair value of their shares, none of which are applicable to the transaction at issue in this case.

**6.** The Moores argue that our decision in *Whetstone v. Hossfeld Mfg. Co.*, 457 N.W.2d 380 (Minn.1990) requires that we interpret Minn.Stat. § 302A.471 broadly enough to include a reverse stock split. In *Whetstone,* a shareholder owning 36% of a closely held corporation's stock brought an action to dissent after the articles of incorporation were amended to indirectly eliminate his veto power. *Whetstone,* 457 N.W.2d at 381. The district court granted the shareholder's motion

for summary judgment, and the court of appeals reversed. *Id.* We reversed, holding that even *indirectly* removing the shareholder's veto power constituted an amendment of the articles that "materially and adversely affects the rights or preferences of the shares of the dissenting shareholder in that it excludes or limits the right of a shareholder to vote on a matter." *Id.* at 382 (quoting Minn.Stat. § 302A.471, subd. 1). We reasoned that investors in a closely held corporation had a strong interest in preventing those in control of the corporation from cutting off a return on investment. *Id.* at 383–84. In *Whetstone,* we focused on a situation in which a minority

that Minn.Stat. § 302A.471 does not provide for dissenters' rights in the event of a reverse stock split.

## III.

The Moores further argue that even if they are not entitled to dissenters' rights under Minn.Stat. § 302A.471 they are entitled to equitable relief under Minn.Stat. § 302A.751. Under Minn.Stat. § 302A.751, subd. 1(b), a buyout can be granted on motion of a shareholder when "the directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders." The district court rejected the Moores' claim, reasoning that in the absence of fraud, granting relief under section 302A.751 would be inconsistent with Minn.Stat. § 302A.423 (making a director's determination of value conclusive in the absence of fraud). *See* *CSG*, 788 N.W.2d at 167. The court of appeals concluded otherwise: "it would be an unusual case in which a court would find no *Sifferle* fraud but find unfairly prejudicial conduct. Nevertheless, given its broad remedial purpose, we read § 302A.751 to require a separate analysis of whether respondents' conduct was unfairly prejudicial." *Id.*

*Whether 302A.751 and .423 are Consistent*

■ We first address whether the court of appeals correctly determined that Minn.Stat. § 302A.423 does not preclude the application of Minn.Stat. § 302A.751 in the absence of fraud. Whenever it is possible to give effect to all statutory provisions, we are required to do so. *See* Minn. Stat. § 645.16. It is possible to give effect to both provisions here. Minn.Stat. § 302A.423 provides that a determination

by the board of the fair value of fractional shares shall be conclusive in the absence of fraud. But section 302A.423 does not say anything about the validity of the underlying transaction with respect to issues other than price. Inadequate value is only one of the ways in which a reverse stock split can be detrimental to a minority shareholder. It may, for example, violate an agreement between shareholders or constitute a breach of fiduciary duty. In such a case, the inability of a minority shareholder to establish common law fraud related to the actual valuation of his shares does not preclude relief under Minn.Stat. § 302A.751. Therefore, we conclude that section 302A.751 clearly permits relief notwithstanding the absence of fraud under section 302A.423.

We also note that the need for further scrutiny does not disappear simply because a reverse stock split complies with Minn.Stat. § 302A.402 and Minn.Stat. § 302A.423. Conduct that is technically legally permissible may nonetheless constitute a violation of rights that should be protected. Recognizing the distinction between narrow technical authorization and broader principles of fairness, the Delaware Supreme Court has said "inequitable action does not become permissible simply because it is legally possible." *Schnell v. Chris–Craft Indus., Inc.*, 285 A.2d 437, 439 (Del.1971), *quoted in* F. Hodge O'Neal & Robert B. Thompson, *O'Neal & Thompson's Oppression of Minority Shareholders and LLC Members* § 7:2 (2d ed.2009). Courts from several jurisdictions have noted that, even when a reverse stock split is allowed by statute, "majority shareholders must meet certain standards of fairness." *Lerner v. Lerner Corp.*, 132 Md.App. 32,

---

investor is unable to realize a return on an investment, or dispose of this investment. *Id.* In this case, however, the investment has been disposed of for fair value or approximately fair value, and therefore, the *Whetstone* rationale does not apply. Also, *Whetstone* did not discuss a reverse stock split, which is specifically authorized by statute.

750 A.2d 709, 721 (Md.Ct.Spec.App.2000) (citations committed) (internal quotation marks omitted); *see also Boland v. Boland*, 194 Md.App. 477, 5 A.3d 106 (Md.Ct. Spec.App.2010); *Teschner v. Chicago Title & Trust Co.*, 59 Ill.2d 452, 322 N.E.2d 54 (1974); *Leader v. Hycor, Inc.*, 395 Mass. 215, 479 N.E.2d 173, 177 (1985); *Clark v. Pattern Analysis & Recognition Corp.*, 87 Misc.2d 385, 384 N.Y.S.2d 660, 662 (N.Y.Sup.Ct.1976).[7] "Fiduciary duty principles provide an opportunity ... to move the case from narrow technical grounds where the action may be unassailable to 'broad considerations of corporate duty and loyalty.'" O'Neal & Thompson, *supra* § 7:3 (2d ed.2009) (quoting *Guth v. Loft*, 5 A.2d 503, 511 (Del.1939)). We therefore conclude that, even in the absence of fraud, Minn.Stat. § 302A.423 does not preclude relief under Minn.Stat. § 302A.751 for a reverse stock split.

*Whether CSG acted Unfairly Prejudicially*

The Moores contend that the CSG's board's actions toward them were unfairly prejudicial. Again, the object of interpretation and construction of laws is to ascertain and effectuate the intention of the Legislature. Minn.Stat. § 645.16. The term "unfairly prejudicial" is not explicitly defined in Minn.Stat. § 302A.751 or elsewhere in Minn.Stat. ch. 302A. Moreover, when applied to a situation such as the one before us, the term is unclear. When legislative intent is unclear from the language of the statute in its application to a given situation, we consider canons of construction and extrinsic sources to determine legislative intent. *See State v. Engle*, 743 N.W.2d 592, 593 (Minn.2008); Minn.Stat. §§ 645.16, 645.17.

The court of appeals has defined the term "unfairly prejudicial" in the context of Minn.Stat. § 302A.751 in *Berreman v. W. Publ'g Co.*, 615 N.W.2d 362, 374 (Minn. App.2000). The court said, "We conclude that unfairly prejudicial conduct ... is conduct that frustrates the reasonable expectations of shareholders in their capacity as shareholders ... of a corporation that is not publicly held...." *Id.* The court in this case applied this definition. *CSG*, 788 N.W.2d at 166–67.

In *Berreman*, the court of appeals concluded that the term "unfairly prejudicial" should be liberally construed. *Berreman*, 615 N.W.2d at 373 (citing Minn.Stat. Ann. § 302A.751, subd. 1(b)(3) (West 1985) reporter's notes–1982 to 1984). The court noted that several courts had defined the term "unfairly prejudicial" as frustration of reasonable expectations. *Id.* at 374 (citing *Kiriakides v. Atlas Food Sys. & Servs., Inc.*, 338 S.C. 572, 527 S.E.2d 371, 386 (S.C.Ct.App.2000)).[8] The court concluded

---

**7.** Our conclusion is strengthened by the fact that those jurisdictions that have denied claims based on fiduciary duty have done so on the basis of dissent and appraisal rights, which generally provide that their remedies are exclusive absent fraud. *See, e.g., Sound Infiniti, Inc. v. Snyder*, 169 Wash.2d 199, 237 P.3d 241 (2010) (citing Wash. Rev.Code § 23B.13.020, subd. 2 (2008)); *Weber v. Iowa State Bank & Trust Co.*, 457 F.3d 857 (8th Cir.2006) (citing Iowa Code § 490.1302.4 (2005)). Minnesota minority shareholders do not have the benefit of dissent and appraisal rights, and are not subject to similar exclusivity provisions. *See* Minn.Stat. § 302A.471.

**8.** Approximately seven months after *Berreman* was decided, the South Carolina Supreme Court overruled *Kiriakides*. *Kiriakides v. Atlas Food Sys. & Servs., Inc.*, 343 S.C. 587, 541 S.E.2d 257 (2001) (*Kiriakides II*). The supreme court concluded that "the Court of Appeals' broad view of oppression is contrary to the legislative intent and is an unwarranted expansion of section 33–14–300." *Kiriakides II*, 541 S.E.2d at 263. Because of the *Berreman* court's reliance on the overruled decision, we examine whether *Kiriakides II* should affect our confidence in the reasoning of the *Berreman* decision.

The test criticized by the South Carolina Supreme Court is significantly broader than

that the "reasonable expectations" language was most consistent with the Legislature's intention in using the term "unfairly prejudicial." *Id.* The court cited the provision in section 302A.751, subd. 3a, providing that courts should take into consideration the reasonable expectations of the shareholders. *Id.* The court also noted that the advisory task force had set out as a goal the desire to "provide, as rules, all of the provisions that would normally be expected to result from associative bargaining" and that the reasonable expectations definition was consistent with this goal. *Id.* (citing Advisory Task Force on Corporation Law, Report to the Senate (1981), *reprinted in* Minn.Stat. Ann. § 302A.001 (West Supp.2000)).

We also take guidance from other statutory provisions in Minn.Stat. ch. 302A. Minnesota Statutes § 302A.751, subd. 3a, provides that in determining whether to grant equitable relief, courts shall "take into consideration the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner in the operation of the corporation and the reasonable expectations of all shareholders." By its terms, this provision applies only to statutory closely held corporations, and CSG is not a statutory closely held corporation.[9] Therefore, subdivision 3a does not apply to the Moores' claims against CSG. But we have said that when statutory language is unclear, we may look to other statutes upon the same or similar subjects. *In re*

*Welfare of Children of N.F.,* 749 N.W.2d 802, 807 (Minn.2008); *Harris v. Cnty. of Hennepin,* 679 N.W.2d 728, 732 (Minn. 2004); *see also State v. Lucas,* 589 N.W.2d 91, 94 (Minn.1999).

In this case, subdivision 3a of section 302A.751 is particularly instructive. Although CSG is not a statutory closely held corporation, it does share many of the same features as a closely held corporation as we have described it under the common law. First, "shareholders are . . . active in the business"—particularly Alexander. *See Westland Capital Corp. v. Lucht Eng'g Inc.,* 308 N.W.2d 709, 712 (Minn.1981). Second, there is no market for a minority interest in the stock. *Id.* Third, dividends are not distributed. *Id.* Minnesota Statutes § 302A.751, subd. 3a, informs our interpretation of the term "unfairly prejudicial" in subdivision 1, and indicates that "unfairly prejudicial" conduct includes conduct that violates the reasonable expectations of the minority shareholder.

■ At least two other states equate unfairly prejudicial conduct with violation of reasonable expectations. *See Kortum v. Johnson,* 755 N.W.2d 432, 441 (N.D.2008); *Icahn v. Lions Gate Entm't Corp.,* No. 651076/2010, 2011 WL 1233362, at *3 (N.Y.Sup.Ct. Mar. 30, 2011) ("The intent of the statute is to provide shareholders a forum for bringing an oppression application whenever the alleged oppressive or unfairly prejudicial conduct adversely affects their reasonable expectations as

---

that articulated by the *Berreman* court. *Kiriakides I* articulated five factors, any one of which was sufficient to demonstrate unfairly prejudicial conduct. *Kiriakides I,* 527 S.E.2d at 387–88. But the *Berreman* court adopted only one of these factors-the reasonable expectations test. *Berreman,* 615 N.W.2d at 374. Therefore, the test articulated by the *Berreman* court is, and always was, much narrower than the broad test criticized by the South Carolina Supreme Court. Moreover,

under the South Carolina statute, dissolution is the only available remedy. Under such a statute, a narrower test of fiduciary duty is appropriate.

9. Closely held corporations are defined as corporations with 35 or fewer shareholders. Minn.Stat. § 302A.011, subd. 6a. It appears from the record that CSG has more than 300 shareholders.

shareholders."). Moreover, courts in several other states apply the reasonable expectations test in determining the meaning of the closely related term "oppressive." *See, e.g., Stefano v. Coppock*, 705 P.2d 443, 446 (Alaska 1985); *Smith v. Leonard*, 317 Ark. 182, 876 S.W.2d 266, 272 (1994); *Fox v. 7L Bar Ranch Co.*, 198 Mont. 201, 645 P.2d 929, 933–34 (1982); *see also* O'Neal & Thompson, *supra* § 7:12. We therefore conclude that in the context of a reverse stock split, unfairly prejudicial conduct under Minn.Stat. § 302A.751 includes conduct that violates the reasonable expectations of the shareholder.[10]

We turn, then, to determine whether those in control of CSG engaged in conduct that frustrated the Moores' reasonable expectations as shareholders. The Moores argue that CSG and Alexander frustrated their reasonable expectations by (1) denying them the fair value of their shares; (2) violating section 7.4 of CSG's bylaws; and (3) acting in a manner inconsistent with the parties' course of dealings.

To prevail on their first argument, the Moores must establish that they did not receive the fair value of their shares. The Moores rely on what the district court characterized as the "fair value" of the common shares at $1,142.92 per share, which is more than the $986.50 per share paid by CSG. But this argument is inconsistent with the provision in Minn.Stat. § 302A.423 which provides that a board's determination of fair value is conclusive absent fraud. Because the decision of fair value was delegated to the Board, and fraud has not been established, the Moores did receive the "fair value" of their shares.[11]

The Moores argue that the reverse stock split at issue also violated section 7.4 of CSG bylaws. Section 7.4 of the bylaws provides that "[t]ransfer of shares on the books of the corporation may be authorized only by the shareholder named in the certificate." A book transfer of stock means a transfer without physical movement of the stock. *See Harriman's Financial Dictionary* 39 (Simon Briscoe & Jane Fuller eds., 2007). The restriction in section 7.4 therefore appears to restrict only transfers by CSG of stock from one owner to another without transfer of the actual stock certificate. But as CSG and Alexander note, there is no evidence that the Moores' shares were transferred only on CSG's books, without a transfer of the actual stock certificates.

The Moores third argument is, based on the parties' course of dealings, that the Moores reasonably expected that they would not be forced out involuntarily at a price set by the Board. The court of appeals concluded that evidence of Alexander's repeated attempts to redeem the Moores' shares supports the district court's finding that the Moores "were completely aware of Alexander's desire to acquire their minority interest and concentrate control of CSG and his intent to operate it as a family business." *CSG*, 788

10. Our opinion today leaves open the possibility that conduct other than conduct violating the reasonable expectations of the shareholder may also be "unfairly prejudicial." Because the Moores only argued on the basis of reasonable expectations, we need not delineate today what other conduct might constitute unfairly prejudicial conduct.

11. We also note the apparent inconsistency of the district court's finding of fair value with Minn.Stat. § 302A.423. Because the Board's determination of fair value is conclusive absent fraud, and the district court concluded that fraud was not present here, the district court's finding that fair value was different from the figure determined by the Board is problematic. Nevertheless, any error would not affect the result here, and we need not address it further.

N.W.2d at 168 (internal quotation marks omitted). We reject the idea that repeated attempts to redeem a shareholder's stock itself legitimizes a later redemption of a shareholders stock if a shareholder otherwise has a reasonable expectation that he or she will not be forced out involuntarily. But shareholders may be forced out involuntarily by statute, for example, in a cash-out merger. *See* Minn.Stat. §§ 302A.613, 302A.641, subd. 1. For this reason, it is unreasonable for a shareholder to expect that their shares may never be redeemed involuntarily. Absent evidence of some other support for the belief that they would be safe from involuntary redemption of their shares, the Moores' expectation of indefinite ownership in CSG is not reasonable. There is no such evidence in the record, and we conclude that the Moores have not shown that they had a reasonable expectation that they would not be cashed out involuntarily.

## IV.

■ The Moores further argue that the court of appeals erred when it concluded that the preferential treatment afforded Alexander and the Alexander Family Trust-treatment that insulated their shares from being fractionalized-was not a breach of fiduciary duty. Specifically, the Moores argue that those in charge of CSG, as a closely held corporation, had a fiduciary duty to treat the Moores fairly, and that preparation to effect the reverse stock split violated this duty.

■ CSG is not a statutory closely held corporation under Minn.Stat. § 302A.011, subd. 6a (defining "closely held corporation" to mean a corporation with 35 or fewer shareholders). We have never decided whether the statutory defi-

nition of a closely held corporation abrogates the common law definition. But in *Berreman*, 615 N.W.2d at 370, the court of appeals concluded that "the common law definition of a close corporation continues to apply for purposes of determining fiduciary relationships." We agree with the *Berreman* court. We presume that "the Legislature does not intend to abrogate the common law unless it does so by express wording or necessary implication." *Siewert v. N. States Power Co.*, 793 N.W.2d 272, 281 (Minn.2011) (citations omitted) (internal quotation marks omitted). The Legislature has not expressly, or by implication, overruled common law fiduciary duties for Minnesota closely held corporations.[12] *Cf.* Del.Code Ann. tit. 8, § 341 (West 2011) ("Unless a corporation elects to become a close corporation under this subchapter in the manner prescribed in this subchapter, it shall be subject in all respects to this chapter, except this subchapter."). We have also continued to cite closely held corporation case law after the enactment of Minn.Stat. § 302A.011, subd. 6a, which was originally enacted in 1983. *See Advanced Commc'n Design, Inc., v. Follett*, 615 N.W.2d 285, 294 (Minn.2000) (*ACD*) (citing *Fewell v. Tappan*, 223 Minn. 483, 493–94, 27 N.W.2d 648, 654 (1947); *Venier v. Forbes*, 223 Minn. 69, 74, 25 N.W.2d 704, 708 (1946)).

At least two other jurisdictions—Illinois and Nevada—have concluded that the enactment of statutory closely held corporation statutes does not abrogate the common-law definition of a closely held corporation. *See Doherty v. Kahn*, 289 Ill.App.3d 544, 224 Ill.Dec. 602, 682 N.E.2d 163 (1997); *Hollis v. Hill*, 232 F.3d 460 (5th Cir.2000) (applying Nevada law); *see also Sery v. Fed. Bus. Ctrs.*,

---

12. The reporter's notes state "This is a new definition used primarily in connection with the Buy–Out on Motion, 302A.751." Minn. Stat. Ann. § 302A.011 reporters notes–1982 to 1984 (West 2011).

*Inc.,* 616 F.Supp.2d 496, 502 (D.N.J.2008) ("the Court is unwilling to accept Plaintiffs' argument that any fiduciary duties that may normally apply are completely abrogated by [statute]."). Because the Legislature has not expressed an intention to abrogate the common law definition or fiduciary duties of a close corporation, we conclude that the common law of closely held corporations is still in effect.

■■■ Under Minnesota common law, a closely held corporation is identified by three characteristics: (1) shareholders are usually active in the business; (2), there is usually no market for a minority interest in the stock; and (3) dividends are seldom distributed. *Westland,* 308 N.W.2d at 712; *see also Donahue v. Rodd Electrotype Co.,* 367 Mass. 578, 328 N.E.2d 505, 511–12 (1975). Minority shareholders in a closely held corporation are often in a vulnerable position, because a majority shareholder can deny them income by refusing to employ them or pay dividends. *Westland,* 308 N.W.2d at 712. Applying these criteria to the case before us, the majority shareholder in terms of voting power (Alexander), is in control and is employed by the corporation. There is no evidence that there is a market for a minority interest in the stock outside the corporation itself. Finally, dividends are not distributed to the common shareholders. We conclude that CSG is a closely held corporation under the common law.

Because CSG is a closely held corporation under the common law, CSG and Alexander had certain fiduciary duties toward the Moores as minority shareholders. We have said that co-owners in a close corporation owe each other "the highest standard of integrity and good faith in their dealings with each other." *Fewell,* 223 Minn. at 494, 27 N.W.2d at 654 (citations omitted) (internal quotation marks

omitted); *see also ACD,* 615 N.W.2d at 293–94 (holding a majority or controlling shareholder owes a fiduciary duty to the corporation or its other shareholders). Beyond this statement, however, we have not defined what this standard entails.

Courts in other jurisdictions have identified three primary standards by which to measure the fiduciary duties of majority shareholders. *See* 6A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 2857.10 (perm.ed., rev.vol.2005). These standards are (1) the business purpose test; (2) the entire fairness test; and (3) the reasonable expectations test. *Id.* Neither party takes a position on which test or tests we should adopt in Minnesota. Moreover, in *Berreman,* the court of appeals did not undertake to define the scope of common law close corporation fiduciary duty, deciding only that majority shareholders have a duty to deal "openly, honestly, and fairly with other shareholders." *Berreman,* 615 N.W.2d at 371 (citing *Pedro v. Pedro,* 489 N.W.2d 798, 801 (Minn.App.1992)). The court concluded that this duty included a duty to disclose material facts. *Id.* (citing *Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 421, 196 N.W.2d 619, 622 (1972)). We need not determine the content of the common law fiduciary duties of a majority shareholder in Minnesota because, even under the standard they allege, the Moores have not demonstrated a breach of fiduciary duty.

The Moores allege that Alexander and the Alexander Family Trust treated themselves preferentially with respect to their use of corporate assets, because the advice to set up a holding company to avoid fractionalization of their stock came at company expense. But as we have mentioned, eliminating a minority shareholder without more is expressly permitted where made possible by the jurisdiction's statutory

scheme. *See Leader,* 395 Mass. at 221, 479 N.E.2d at 177 ("minority shareholders are bound by majority rule to accept cash or debt in exchange for their common shares, even though the price they receive may be less than the value they assign to these shares. But this alone does not render freezeouts objectionable." (citations omitted) (internal quotation marks omitted)); *Lerner v. Lerner,* 306 Md. 771, 511 A.2d 501, 505–07 (1986) (stating that judicial relief was not required "simply because the majority use[s] the letter of the corporation statutes to acquire the shares of the minority who are unwilling to sell and who claim the price is inadequate.").

None of the cases cited by the Moores stand for the proposition that merely conducting an involuntary redemption of the stock of minority shareholders at a fair price, without more, can constitute a breach of fiduciary duty.[13] *See Crosby v. Beam,* 47 Ohio St.3d 105, 548 N.E.2d 217, 218 (1989) (noting that use of corporate funds for personal use constitutes a breach of fiduciary duty); *Tillis v. United Parts, Inc.,* 395 So.2d 618, 619 (Fla.Dist.Ct.App. 1981) (holding use of corporate surplus to buy back majority stock while denying liquidity to minority constituted breach of fiduciary duty); *Comolli v. Comolli,* 241 Ga. 471, 246 S.E.2d 278, 281 (1978) (same); *Clark,* 384 N.Y.S.2d at 664–65 (holding where there is an allegation of fraud, illegality or bad faith and no compelling business purpose, a minority shareholder may have a breach of fiduciary duty claim); *Edick v. Contran Corp.,* No. 7662, 1986 WL 3418 (Del.Ch.1986) (holding nondisclosure of material information related to reverse stock split sufficient to state a claim for breach of fiduciary duty); *Kirtz v. Grossman,* 463 S.W.2d 541, 544–45 (Mo. App.1971) (holding that paying price to minority for stock that is demonstrably lower than fair value constitutes breach of fiduciary duty); *Sullivan v. First Mass. Fin. Corp.,* 409 Mass. 783, 569 N.E.2d 814, 817 (1991) (holding price must be fair and reasonable); *Lebold v. Inland Steel Co.,* 125 F.2d 369, 373–74 (7th Cir.1941) (holding that asset sale depriving minority shareholders of all returns on investment is breach of fiduciary duty). Therefore, under any standard, to establish a breach of fiduciary duty, the Moores must establish some conduct beyond the mere use of a reverse stock split to redeem the stock of the minority shareholders.

We conclude that the Moores have not done so. The conduct that the Moores complain of is the consolidation of the shares of the majority into a holding company to avoid their fractionalization. But the consolidation of the majority's stock was nothing more than a discrete step in the process necessary to effect the redemption of minority shares in the reverse stock split. The process of conducting a reverse stock split, without more, does not establish any of the myriad grounds that might justify relief for a breach of common law fiduciary duty.

## V.

The Moores argue that Cobb's valuation methodology is flawed as a matter of law, because he relied on net asset value to value CSG, used book value to establish the value of CSG's equipment and machinery, and used the discounted cash valuation methodology to value CSG.

We have said that to determine fair value, the trial court may rely on proof of value by any technique that is generally accepted in the relevant financial community and should consider all relevant fac-

---

**13.** In addition to the cases cited here, the Moores also cite *Lerner* and *Leader*. Given the language we cite above, these cases do not support the Moores' argument.

tors, provided the value is fair and equitable to all parties. *See ACD,* 615 N.W.2d at 290. We have also explicitly rejected the use of bright-line rules in the valuation context. *Id.* at 292. Courts in other jurisdictions are similarly deferential to trial court determinations of fair value. *See, e.g., Nw. Inv. Corp. v. Wallace* 741 N.W.2d 782, 785 (Iowa.2007); *Cede & Co. v. Technicolor, Inc.,* 884 A.2d 26, 35 (Del.2005); *Dodd v. Potomac Riverside Farm, Inc.,* 222 W.Va. 299, 664 S.E.2d 184, 190–191 (2008). The Moores assertion that the district court was categorically wrong to accept the use of net asset value, book value, or discounted cash value is inconsistent with our deferential review of valuation decisions. *ACD,* 615 N.W.2d at 292. Therefore, we conclude that the district courts acceptance of Cobbs valuation was not erroneous as a matter of law.

## VI.

 Finally, the Moores contend that they are entitled to interest on the payment for their shares, and to costs and fees incurred as a result of this litigation. The Moores rely on Minn.Stat. § 302A.473, subd. 5(a), which provides:

> After the corporate action takes effect, or after the corporation receives a valid demand for payment, whichever is later, the corporation shall remit to each dissenting shareholder who has complied with subdivisions 3 and 4 the amount the corporation estimates to be the fair value of the shares, plus interest.

But because we determine that the Moores were not entitled to dissenters' rights under Minn.Stat. § 302A.471, Minn.Stat. § 302A.473 does not apply, and the Moores are not entitled to interest under this provision.

The Moores also rely on Minn.Stat. § 549.09 (2010), which provides for interest on judgments or awards. But the Moores

have not yet received a judgment or award, and therefore Minn.Stat. § 549.09 does not apply.

 Finally, the Moores claim that the district court improperly denied them attorney fees and expenses. Such an award is only proper when a party prevails. Specifically, Minn.Stat. § 302A.467 provides:

> If a corporation or an officer or director of the corporation violates a provision of this chapter, a court [may] ... grant any equitable relief it deems just and reasonable in the circumstances and award expenses, including attorneys' fees and disbursements, to the shareholder.

Because we conclude that the district court did not err, the Moores are not entitled to costs and attorney fees.

Affirmed.

STRAS, J., took no part in the consideration or decision of this case.