# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-2957

_____

Baljinder Sandhu, individually; Glow Hospitality, LLC, a Minnesota Limited
Liability Corporation

*Plaintiffs - Appellants*

v.

Jay L. Kanzler, Jr., individually; Witzel, Kanzler & Dimmitt, LLC, a Missouri
Limited Liability Corporation

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: March 12, 2019
Filed: August 5, 2019

_____

Before SHEPHERD, ARNOLD, and KOBES, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Baljinder Sandhu and Glow Hospitality, LLC appeal the district court's[1] adverse grant of summary judgment on their fraud and breach of fiduciary duty claims against attorney Jay Kanzler and their vicarious liability claims against Kanzler's employer, Witzel, Kanzler & Dimmitt, LLC (WKD). Underlying this case is "an extremely complex factual background and multiple intersecting allegations of conflicts of interest and other breaches of fiduciary duty. . . . The Court itself has had . . . difficulty sorting through the parties' claims . . . ." See Afremov v. Sulloway & Hollis, P.L.L.C., 922 F. Supp. 2d 800, 816-17 (D. Minn. 2013). Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

During the summer of 2007, Shivcharan Singh solicited investment funds from Baljindar Sandhu in order to purchase and run a Holiday Inn Express in Bemidji, Minnesota. Sandhu understood that, in exchange for $300,000, he would receive a 70% ownership interest in the hotel, Singh would retain a 15% interest, and a third investor would also receive a 15% interest. Pursuant to this agreement, North East Property, LLC, of which both Sandhu and Singh were members, transferred $100,000 to Singh to finance the hotel's purchase and payment of a franchise fee.

Following Singh's interactions with Sandhu, Singh began working with brothers Harkrishan (Harry) and Devindar Khatkar to participate in acquisition of the hotel. In September 2007, Singh approached Missouri attorney Jay Kanzler on behalf of the Khatkars to organize a limited liability company, Glow Hospitality, LLC, to purchase and operate the hotel. Kanzler agreed to represent the Khatkars, who retained him on September 20, 2007. The engagement letter provided Kanzler's clients were the Khatkars and, once the company was created, Glow itself, but

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Kanzler understood that Singh had authority to act on behalf of the Khatkars and assist in transactions. The engagement letter made no reference to Sandhu as either Kanzler's client or a member of Glow, but Sandhu knew Kanzler had been engaged to create Glow.

Kanzler filed Glow's articles of organization on October 5, 2007. The articles listed Harry and Devindar as Glow's sole organizers. Glow's Operating Agreement, executed that same day, indicated that Harry and Devindar each held a 50% ownership interest in Glow. Sandhu received a copy of this agreement and knew about the ownership interests it disclosed. Sandhu testified that, in the fall of 2007, he spoke to Kanzler, Singh, and Harry about his ownership interests in Glow via conference call, but Kanzler denies this. Regardless, Sandhu's ownership interest in Glow was not documented at this time.

On December 3, 2007, Singh emailed Kanzler and asked him to change Glow's division of ownership to 85% for Devindar and 15% for Harry. Kanzler supplied Singh with a modified Operating Agreement reflecting this change. Sandhu received a copy. The next day, Sandhu provided Kanzler with escrow information regarding the hotel purchase. None of Sandhu's emails mentioned his purported ownership interest in Glow. On December 6, North East Property, LLC, of which both Sandhu and Singh were members, transferred $198,500 to Glow as the final deposit for the hotel's purchase.

The closing on the purchase of the Bemidji Holiday Inn Express occurred on January 10, 2008. Sandhu did not attend and his signature does not appear on any of the loan documents.[2] Rather, the lenders understood that Glow was equally owned

---

[2]Glow executed four mortgages at the closing with four different parties. Sandhu was not identified as an owner or member of Glow on any of these documents.

by Harry and Devindar.  On January 15, 2008, the Khatkars executed a franchising license agreement with Holiday Hospitality Franchising, Inc.  This agreement disclosed Harry and Devindar as Glow's sole owners, with shares of 15% and 85%, respectively.  On completion of the final closing documents, Glow began operating the Bemidji hotel without further involvement from Kanzler.

In November 2008, Kanzler's clients directed him to prepare an Amended Operating Agreement and related documents redistributing Glow's ownership interests and indicating that Harry owned 48% of Glow, Devindar 3%, and Singh 49%.  Kanzler drafted a membership interest assignment and assumption agreement and an Amended Operating Agreement on November 4, 2008 and emailed these documents to Singh.  However, Kanzler did not speak directly to Devindar about his ownership interest reduction, stating that he generally sent documents to Singh, who would secure the necessary signatures and send the documents back.

In December 2009, Sandhu met with Harry and Singh.  He obtained a handwritten document, signed by the three men, which indicated Sandhu had invested almost $300,000 in the Bemidji hotel in exchange for a 40% ownership interest.  Kanzler was not present at this meeting and Sandhu did not send Kanzler the document.  Glow's 2008 tax return described Glow's members as Sandhu, Harry, and Ajmer Singh.[3]  While Kanzler did not participate in preparing the return, he did discuss Sandhu's 40% ownership interest with Harry and Singh at some point after December 12, 2010.

In 2010, Singh and Glow were named as defendants in a California lawsuit unrelated to the Bemidji hotel.  Singh signed and filed a declaration that stated he was neither a member nor an owner of Glow.  He reiterated this statement in a deposition, stating that the Khatkars were Glow's sole members.  However, Singh later corrected

---

[3]It is unclear from the record who, exactly, Ajmer Singh is.

his deposition testimony to say that he was not a member of Glow in July 2008, but subsequently became one. Harry executed a declaration in the same lawsuit stating that he and Devindar were Glow's only members. Kanzler did not participate in this litigation or in the execution of Singh and Harry's declarations. In the summer of 2010, Harry filed for bankruptcy in California. A schedule filed with his bankruptcy petition claimed a 15% ownership interest in Glow. Kanzler had no role in and was not informed about Harry's bankruptcy petition.

At a meeting in September 2010, Sandhu and other investors accused Harry and Singh of diverting funds away from Glow. Sandhu testified that he also spoke to Kanzler about his concerns. After the meeting, Sandhu attempted to gain control of Glow's deposit accounts in order to prevent Singh and Harry from diverting funds. First National Bank of Bemidji, which held the operating account for Glow, became concerned about the changes, froze the account, and requested opinion letters from counsel for Glow and Sandhu regarding Glow's ownership.

Kanzler informed Sandhu and Devindar's attorney, Greg Gilbert, that he believed Harry, Devindar, and Singh owned Glow, and he provided Gilbert with copies of the 2008 Amended Operating Agreement and related documents. Kanzler also provided the bank's president with this documentation and opined—based on Glow's corporate governance documents, documents previously executed by Devindar, conversations with his clients, and Singh and Harry's sworn declarations—that Singh owned 49% of Glow, Harry 48%, and Devindar 3%. In addition, Harry faxed a corporate resolution to First National, which, by unanimous consent, stated that the Khatkars were Glow's only members, removed Singh and Sandhu as signators on Glow's bank accounts, and established Harry as Glow's sole authorized signator for Glow's First National accounts.

Gilbert responded that the 2008 amended documents were neither credible nor reliable and that Glow's ownership was as it appeared in the December 2007 version

of the Operating Agreement—Harry with 15% and Devindar with 85%. He stated that he considered Devindar's signatures on the corporate resolution and the November 2008 documents to be forged and that Devindar had not received executed copies of the November 2008 documents until Singh faxed them to him in September 2010.

Neither attorney opined that Sandhu held an ownership interest in Glow. The bank deferred to Kanzler, due to his familiarity with Glow, and determined that the corporate resolution was a legitimate exercise of Glow's majority owners' authority. Gilbert then contacted Kanzler, telling him that Singh and Harry were liars and that Kanzler had "an affirmative duty to go back to [his] clients and check out the veracity of their claims and update [his] opinion." Kanzler did not change his opinion.

Between November 2010 and January 2011, Glow was declared in default of its franchise licensing agreement with Holiday Hospitality Franchising and on one of its loans and delinquent on another loan. However, Glow cured its licensing agreement default in February 2011 and entered a forbearance agreement in March 2011 regarding the loan default. It is unclear from the record whether Glow cured its delinquency on the second loan.

Sandhu and Devindar filed suit against Glow, Harry, Singh, and GIO Management, Inc.—a company owned by Singh—on December 12, 2010 in Minnesota state court. Kanzler was not named as a defendant. In their complaint, Sandhu and Devindar asserted claims for fraud, breach of contract, and breach of fiduciary duties, alleging that they had invested over $400,000 into Glow in exchange for majority ownership and that Singh and Harry had illegally distributed corporate funds. They sought inspection of corporate records, the fair value of membership interests, and appointment of a receiver.

-6-

The Minnesota state court defendants initially contacted Kanzler for assistance with the lawsuit. Kanzler secured local counsel for them and executed an affidavit detailing his knowledge of Glow's ownership and solvency. The affidavit stated that Sandhu had no ownership interest in Glow and that Kanzler knew of no documentation suggesting otherwise. On January 4, 2011, the plaintiffs' motion to appoint a receiver was denied. In August, Kanzler withdrew from participation because he could be called as a fact witness. In October, Devindar withdrew as a plaintiff after Harry purchased his ownership interest for $60,000. Sandhu then filed a second motion to appoint a receiver.

In January 2012, Kanzler provided a second affidavit restating his knowledge of Glow's corporate records and financial situation and the documents executed at closing based on his communication with Harry, Singh, and Glow's on-site managers. Kanzler reiterated his belief that Sandhu never had an ownership interest in Glow. Defense counsel later contacted Kanzler, expressing concern about documentation he had recently received from Sandhu. Notably, defense counsel mentioned the December 2009 document signed by Harry and Singh that recognized Sandhu had a 40% ownership interest in Glow. Kanzler responded that every transaction could be explained and that, as a non-member, Sandhu had no right to an accounting of Glow.

On April 30, 2012, the state court appointed a receiver for Glow. Harry and Singh subsequently chose to abandon the litigation, and the state court entered a default judgment against them on June 25, 2012, granting Sandhu a 70% ownership interest in Glow. The court subsequently awarded Sandhu $1,215,940.25 in monetary damages against Harry, Singh, and GIO.

On August 16, 2016, after unsuccessful attempts to collect on the judgment against Singh and Harry, Sandhu and Glow brought suit in Minnesota state court against Kanzler and his law firm, WKD. Glow asserted two breach of fiduciary duty claims, one against Kanzler and one against both Kanzler and WKD, while Sandhu

asserted collusion and fraud claims against Kanzler. Both Glow and Sandhu additionally sought to hold WKD vicariously liable for Kanzler's actions. Kanzler and WKD removed the case to federal court and, after extensive discovery, moved for summary judgment. They argued that the statute of limitations precluded the claims, that the plaintiffs failed to support their claims with expert affidavits as required by Minnesota law, and that the Complaint failed to raise a genuine issue of material fact.

The district court found that Minnesota's six-year statute of limitations prevented it from considering discrete acts that occurred prior to August 16, 2010. It nevertheless found that Sandhu and Glow alleged sufficient discrete acts occurring after that date for their claims to be within the limitations period. It found, however, that Glow failed to support its breach of fiduciary duty claims with expert affidavits as required by Minnesota law, that the record contained no evidence that Kanzler engaged in fraud or assisted or encouraged Singh and Harry in committing fraud, and that, because the claims against Kanzler failed on the merits, WKD could not be held vicariously liable. The district court therefore granted summary judgment in favor of Kanzler and WKD and dismissed the Complaint.

Sandhu and Glow appeal. Because this is an appeal from an adverse grant of summary judgment, we apply de novo review, viewing disputed facts in the light most favorable to the nonmoving party. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). We now address each claim in turn.

II.

"Minnesota law recognizes various legal theories of recovery related to attorney misconduct, including intentional fraud and misrepresentation, breach of contract, breach of fiduciary duty, and professional negligence." Noske v. Friedberg, 713 N.W.2d 866, 875 (Minn. App. 2006). Under Minn. Stat. § 544.42, if a plaintiff

alleges legal malpractice claims that require expert testimony to make out a prima facie case, that plaintiff must submit two affidavits in support of his claims.

> The first affidavit, the expert review affidavit, generally must be served upon the defendant with the pleadings, and must contain a statement that, "in the opinion of [the] expert, the defendant deviated from the applicable standard of care and by that action caused injury to the plaintiff." The second affidavit, the expert disclosure affidavit, must be served upon the opponent within 180 days of the commencement of discovery . . . .

Guzick v. Kimball, 869 N.W.2d 42, 47 (Minn. 2015) (alteration in original) (citations omitted) (quoting Minn. Stat. § 544.42, subd. 3(a)(1)).

Section 544.42 does not apply if "the conduct complained of can be evaluated adequately by a jury in the absence of expert testimony." Fontaine v. Steen, 759 N.W.2d 672, 677 (Minn. App. 2009) (quoting Hill v. Okay Constr. Co., 252 N.W.2d 107, 116 (Minn. 1977)). However, attorney misconduct cases in which a plaintiff may dispense with expert testimony are "rare and exceptional." Id. (quoting Sorenson v. Saint Paul Ramsey Med. Ctr., 457 N.W.2d 188, 191 (Minn. 1990)) (internal quotation marks omitted). If the plaintiff fails to comply with § 544.42 and his claim requires expert testimony to establish a prima facie case, that claim must be dismissed. Minn. Stat. § 544.42, subd. 6(a), (c); Fontaine, 759 N.W.2d at 677.

Counts I and II of the Complaint allege that Kanzler and WKD breached their fiduciary duties to Glow, their former client. The district court found that fiduciary duty claims stemming from an attorney-client relationship are derivative of legal malpractice claims and are, therefore, subject to the requirements of § 544.42. Because Glow failed to submit an expert witness affidavit or disclose an expert

witness in accordance with this statute, the district court granted summary judgment for Kanzler and WKD on these claims.

To make out a prima facie case for legal malpractice and receive monetary damages, a plaintiff must show that his attorney breached the applicable standard of care and thereby caused him injury. See Guzick, 869 N.W.2d at 48-49; Brown-Wilbert, Inc. v. Copeland Buhl & Co., 732 N.W.2d 209, 218 (Minn. 2007). But see Perl v. Saint Paul Fire & Marine Ins. Co., 345 N.W.2d 209, 212-13 (Minn. 1984) (holding that a client need not prove additional injury if the client is merely seeking to recover compensation paid to the attorney). Minnesota courts generally require expert testimony on the elements of duty and breach. Guzick, 869 N.W.2d at 49; Wartnick v. Moss & Barnett, 490 N.W.2d 108, 116 (Minn. 1992); see also Noske, 713 N.W.2d at 874 (stating that "[e]xpert testimony is generally required to establish both the standard of care and breach" in legal malpractice cases).

A claim for breach of a fiduciary duty that arises out of an attorney-client relationship is "essentially . . . [a] malpractice claim in another form." Wells v. Mattox, No. A15-1771, 2016 WL 3223227, at *5 (Minn. App. June 13, 2016) (unpublished); see also Antone v. Mirviss, 720 N.W.2d 331, 333-34 (Minn. 2006); Afremov, 922 F. Supp. 2d at 815. Because claims dealing with breach of a standard of care or conduct generally require expert testimony, it follows that claims for breach of an attorney-client fiduciary duty require compliance with § 544.42 unless the attorney's conduct can be adequately evaluated by the jury without an expert's opinion. See Wartnick, 490 N.W.2d at 116.

A.

Count I of the Complaint alleges that Kanzler and WKD breached their fiduciary duties to Glow by engaging in conduct that created a conflict of interest. Claims related to conflicts of interest generally lie outside of the jury's common

knowledge.  See Meyer v. Dygert, 156 F. Supp. 2d 1081, 1091 (D. Minn. 2001). These claims thus require expert testimony to prove the elements of duty and breach. See id.

Glow argues that it is exempt from the statutory expert affidavit requirements and did not have to prove duty or breach as part of its prima facie case because Count I is premised upon Kanzler's intentional acts.  Glow points to Noske v. Friedberg, 713 N.W.2d at 876-77, to support this proposition.  However, Noske does not exempt claims for breach of fiduciary duty premised on intentional actions from the typical prima facie requirements; it merely stands for the proposition that a negligence claim cannot be premised upon intentional acts.  Id.  Notably, the plaintiff in Noske presented an expert affidavit, id. at 870, making Noske entirely dissimilar to the instant case.

Glow primarily bases Count I on allegations that Kanzler impermissibly conducted conflicting concurrent representation of adverse parties.  We note that a similar claim sounded in legal malpractice in Hill v. Okay Construction Co., the case upon which the dissent relies, and that the claim in Hill *was* supported by expert testimony.  252 N.W.2d at 115-16 (stating that both parties offered expert testimony on the issue of whether the defendant attorney impermissibly engaged in dual representation).  Further, Glow does not allege that Kanzler engaged in straightforward conduct such as that described in the dissent's hypothetical illustration—"a clear case of [an attorney] stealing client funds."  Meyer, 156 F. Supp. 2d at 1091.  Rather, Count I is premised on a factually-complex relationship and intertwined history and on allegations that Kanzler failed to disclose information, failed to investigate, made false statements to the state court, and, primarily, engaged in dual representation.  See Complaint 21-22, Dist. Ct. Dkt. 1.  Because such a claim lies outside the jury's common knowledge, Glow was required to support Count I with expert testimony.  It failed to do so, and  Glow's failure to comply with Minn. Stat. § 544.42. mandates dismissal of this claim.  We therefore find that the district

-11-

court correctly granted summary judgment in favor of Kanzler and WKD on Count I.

## B.

Count II of the Complaint alleges that Kanzler breached his fiduciary duties to Glow by failing to conduct further investigation into Glow's ownership interests, failing to update his opinion letter to First National, making false representations in his affidavits to the state court, and negligently overseeing Harry and Singh in their operation of Glow. On appeal, Glow narrows its argument, contending that Kanzler violated Minn. Stat. § 481.06 and that this violation equates to a breach of fiduciary duty. Under § 481.06, attorneys may not "seek to mislead the judges by any artifice or false statement of fact or law[.]" Glow contends that Kanzler violated this duty of candor to the court by acting as a witness in the state court case while simultaneously representing a party in that case. However, Glow fails to present any argument or point to any facts tending to show how Kanzler's actions violated the statutory duty. Glow has therefore waived this argument on appeal. See Chay-Velasquez v. Ashcroft, 367 F.3d 751, 756 (8th Cir. 2004) ("Since there was no meaningful argument on this claim in [the appellant's] opening brief, it is waived.").

Glow also contends that Kanzler violated § 481.06 by misrepresenting Glow's ownership in the two affidavits he filed in the state court proceedings. Glow argues that Kanzler had an affirmative duty to conduct further investigation into Glow's ownership and that his failure to do so renders his affidavits to the state court knowingly false. This claim, then, hinges on two separate duties: the statutory duty of candor, and an affirmative duty to investigate.

While Glow failed to submit any expert witness affidavits to the district court, it argues § 544.42's expert affidavit requirements do not apply to this claim for two reasons. It first contends that § 544.42 does not apply because this claim is based on

-12-

breach of a statutory, rather than common law, duty. Glow provides no authority for this proposition and we therefore decline to find that § 544.42 categorically does not apply to claims based on statute. See Cox v. Mortg. Elec. Registration Sys., Inc., 685 F.3d 663, 674 (8th Cir. 2012) (stating that the appellants "waived [an] issue by failing to provide . . . citation to relevant authority in their opening brief").

Glow next argues that § 544.42 does not apply to this claim because "the matters in issue fall within the area of common knowledge and lay comprehension." Hill, 252 N.W.2d at 116. However, Glow's claim is not premised on straightforward acts or omissions such as "an obviously missed deadline or a clear case of stealing client funds"—the sort of case that does not require expert testimony. Meyer, 156 F. Supp. 2d at 1091. Rather, Glow alleges that Kanzler had an affirmative duty to conduct further investigation into Glow's ownership after Devindar's attorney told him that Devindar denied signing certain documents, and that, by submitting affidavits to the state court without conducting that further investigation, he misled the state court. Therefore, in order to prevail on this claim, Glow must show that Kanzler had a duty to investigate and that he failed to perform that duty.

Based upon the complexity of this case, we do not believe it is the "rare and exceptional" case that may dispense with expert testimony. See Fontaine, 759 N.W.2d at 677. We therefore conclude that § 544.42 applies to Count II, and that Glow's failure to comply with § 544.42's affidavit requirements mandates dismissal of this claim. We affirm the district court's grant of summary judgment on Count II.

III.

Count III of the Complaint alleges that Kanzler committed fraud against Sandhu by refusing to acknowledge his ownership interest in Glow and by directing Singh and Harry to misappropriate Sandhu's investment. Fraud in Minnesota requires (1) a false representation of a material fact; (2) knowledge of falsity or that

-13-

the speaker does not know whether the statement is true or false; (3) intent to induce reliance; (4) actual reliance; and (5) damages. U.S. Bank N.A. v. Cold Spring Granite Co., 802 N.W.2d 363, 373 (Minn. 2011). "Fraud may also be established by concealment of the truth." Id. The intent element distinguishes fraud from negligence. Noske, 713 N.W.2d at 876.

The district court granted summary judgment to Kanzler on this claim because Sandhu failed to present any evidence Kanzler knew about Sandhu's ownership interest or Singh and Harry's misappropriation of Sandhu's investment. On appeal, Sandhu first argues that Kanzler intentionally concealed from him that Glow's ownership structure deprived him of his ownership interest. However, it is undisputed that Sandhu knew he was not a documented member of Glow and that he did not sign any of the documents to effectuate the hotel's purchase. Moreover, Sandhu admitted at his deposition that he had no evidence Kanzler knew he should have been a documented owner of the company.

Second, Sandhu argues that the document he signed in 2009 giving him a 40% ownership stake in the hotel shows that Kanzler knew his ownership interest was valid. However, Sandhu presented no evidence that anyone instructed Kanzler to modify Glow's ownership structure in reliance on that document—or any other document stating Sandhu had an ownership interest—or that Kanzler knew the document existed before state court proceedings commenced. Notably, Sandhu himself disputes the accuracy of that document, claiming that he had a 70% ownership stake in the company rather than a 40% interest. We agree with the district court that "Kanzler cannot be liable for Sandhu's failure to properly protect his own investment." Sandhu v. Kanzler, Civ. No. 16-3066 ADM/LIB, 2018 WL 3862774, at *11 (D. Minn. Aug. 14, 2018).

Third, Sandhu argues that Kanzler directed Singh and Harry to misappropriate Sandhu's investment with the intention of depriving Sandhu of that investment.

-14-

However, Sandhu admitted at his deposition that he had no specific evidence Kanzler directed Singh and Harry's conduct. Moreover, Kanzler had no involvement with the hotel's day-to-day operations, and as discussed above, Sandhu presented no evidence that Kanzler knew of his ownership interest. Based on these facts, we agree with the district court that Sandhu failed to present evidence Kanzler knew about Sandhu's ownership interest in Glow. Without knowledge of Sandhu's ownership interest, Kanzler could not direct Singh and Harry to conceal the truth about Sandhu's documented ownership interest, thereby misappropriating Sandhu's investment, or form the intent to induce reliance on such representations. See U.S. Bank, 802 N.W.2d at 373. We therefore affirm the district court's grant of summary judgment to Kanzler on Sandhu's fraud claim.

## IV.

Appellants' final claim against Kanzler alleges that Kanzler aided and abetted Harry and Singh in violating the fiduciary duties the two owed Sandhu as a co-owner of Glow. "A claim for aiding and abetting the tortious conduct of another has three basic elements" under Minnesota law: "(1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach." Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999). An attorney is liable to third parties for his client's actions if he "knowingly participates with his client in the perpetration of a fraudulent or unlawful act." McDonald v. Stewart, 182 N.W.2d 437, 440 (Minn. 1970). Minnesota courts construe these requirements narrowly when dealing with aiding-and-abetting liability against professionals. Witzman, 601 N.W.2d at 186-87.

To prevail on this claim, Sandhu must show that Kanzler substantially assisted or encouraged Singh and Harry in breaching their fiduciary duties. The district court

found that Sandhu presented no evidence that Kanzler did so, and we agree. As discussed in Part III, <u>supra</u>, Sandhu presented no evidence that Kanzler knew of Sandhu's ownership interest. Without knowing that Sandhu held an ownership interest in Glow, Kanzler could not know that Harry and Singh's conduct violated fiduciary duties owed to Sandhu as a result of that interest. Kanzler had no involvement in Glow's day-to-day operations. The affidavits Kanzler provided to the state court accurately recite information contained in Glow's corporate documents or provided to Kanzler by his clients. Based on these facts, we conclude Sandhu failed to present evidence showing that Kanzler knew of and substantially assisted or encouraged Harry and Singh's breaches of their fiduciary duties to Sandhu, and we affirm the district court's grant of summary judgment to Kanzler on this claim.

V.

Lastly, we address Appellants' claims of breach of fiduciary duty, fraud, and collusion against WKD based on vicarious liability. An employer may be liable for its employee's torts if the employee acted within the scope of his employment when he committed the tortious conduct. <u>Hagee v. Burmeister & Assoc.</u>, 633 N.W.2d 497, 503-04. As discussed above, we find as a matter of law that Appellants have failed to establish that Kanzler committed tortious conduct. We therefore conclude that Appellants cannot survive summary judgment on their claims based on vicarious liability against WKD, and we affirm the district court's grant of summary judgment for WKD.

VI.

We affirm the district court's judgment in full.

-16-

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I respectfully differ with the court on two points. First, I do not think that Glow's breach-of-fiduciary-duty claim based on an attorney's duty of loyalty is subject to the expert-affidavit requirements of Minn. Stat. § 544.42. That statute requires expert affidavits only "[i]n an action against a [licensed attorney] alleging negligence or malpractice in rendering a professional service where expert testimony is to be used by a party to establish a prima facie case." Minn. Stat. § 544.42, subd. 2. But, as the court recognizes, clients may assert a variety of claims against attorneys, "including intentional fraud and misrepresentation, breach of contract, breach of fiduciary duty, and professional negligence." *See Noske*, 713 N.W.2d at 875. By its terms, § 544.42 does not apply to all claims clients make against their attorneys; it applies only to claims involving "negligence or malpractice . . . where expert testimony is to be used."

The court suggests that all breach-of-fiduciary-duty claims arising out of the attorney-client relationship are essentially malpractice claims requiring expert testimony that must comply with § 544.42. But some breach-of-fiduciary-duty claims sound in fraud and not negligence and thus do not trigger § 544.42. Take, for example, a hypothetical case where an attorney convinces Client *X* to give him money for safekeeping, but, as part of a fraudulent scheme, the attorney misappropriates the money to Client *Y* instead. Client *X* would certainly have a claim against the attorney for breaching his fiduciary duty of loyalty, yet this is not a situation where an expert could assist the jury by explaining how the attorney's behavior fell below a standard of care; rather, the breach-of-fiduciary-duty claim would be based on the attorney's intentional, fraudulent behavior, and § 544.42 would not come into play. Here, the gravamen of Glow's claim is that Kanzler made intentional misrepresentations advancing Singh's and Harry's interests at the expense of its own, namely by allowing them to dissipate Glow's accounts. These facts sound in fraud, not negligence, so § 544.42 is inapplicable.

The court notes that "[c]laims related to conflicts of interest generally lie outside of the jury's common knowledge," and from that general principle it concludes that Glow's claim must depend on expert testimony. But the Supreme Court of Minnesota has expressly recognized that "expert testimony is not necessary when the matters to be proven are within the area of common knowledge and lay comprehension." *See Hill*, 252 N.W.2d at 116. A jury does not need an expert to opine that an attorney should not help one client bleed another client dry. Kanzler suggests that *Hill* is of no moment since it predates the enactment of § 544.42. But that suggestion is wrong: That statute says nothing about when a plaintiff must have an expert to prove his case; it merely sets out what a plaintiff must do "where expert testimony is to be used by a party to establish a prima facie case."

I concur in the court's decision to affirm summary judgment on Sandhu's other breach-of-fiduciary-duty claim grounded in the duty of care. Sandhu alleges that Kanzler should have investigated Glow's true ownership but negligently failed to do so. Because such a claim sounds essentially in malpractice, where expert opinions are necessary, and Glow provided none, I concur in this part of the court's opinion.

I also respectfully differ with the court when it upholds summary judgment against Sandhu on his claims because, the court says, he "presented no evidence that Kanzler knew of Sandhu's ownership interest." On summary judgment, we must view the facts in a light most favorable to the nonmoving party (Sandhu here), and "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). To my mind, Sandhu has presented sufficient evidence that Kanzler did in fact know about Sandhu's ownership interest and yet made material misrepresentations to the contrary.

First and foremost, Sandhu testified that he spoke with Kanzler and others during conference calls in 2007 where Glow's true ownership structure, including

Sandhu's ownership stake, was discussed. Kanzler denied Sandhu was on these calls. The court either accepts Kanzler's version of events or dismisses the dispute as immaterial by noting that Sandhu's ownership interest was not documented. It is unclear why the fact that Sandhu's ownership interest was not documented should matter. Sandhu's testimony that he discussed his ownership interest with Kanzler on the conference calls undermines the court's holding that Sandhu presented no evidence that Kanzler knew of Sandhu's ownership interest, especially since Sandhu offers evidence that the record owners were not the actual owners: he has a signed writing from Singh and Harry and a tax return, both indicating that he owned part of Glow, along with a state-court judgment awarding him an ownership interest in Glow. His account of the conference calls alone is therefore enough to let a jury decide whether Kanzler was aware of Sandhu's ownership interest.

But there's more. Sandhu said that he and others confronted Kanzler, Singh, and Harry in 2010 regarding the trio's fraudulent activities. If such a confrontation indeed occurred, then Kanzler would have known that Sandhu had at least asserted an interest in Glow, and it could be inferred that Kanzler either knew Singh and Harry were fraudsters or at least suspected it. Furthermore, Sandhu's attorney informed Kanzler that Singh had twice disclaimed any interest in Glow under oath, that Devindar swore his signatures purporting to reduce his interest and give control of the bank accounts to Harry were fake, and that Harry had sworn under oath that Singh did not own an interest in Glow. Kanzler nonetheless doubled down on his opinions by telling a state court in an affidavit, in an attempt to hold off the appointment of a receiver, that "Sandhu has never had an ownership interest in Glow. There was never a mention of this individual before or at closing." But, as the court notes, Sandhu had previously contacted Kanzler about closing on the hotel, and if we believe Sandhu (as we must at this stage) about the conference calls and the 2010 confrontation, then Kanzler's statement is demonstrably false. It should, moreover, have been clear to Kanzler that Sandhu had some role at Glow since he was a signatory on Glow's bank

-19-

account—a fact Kanzler should have known given the effort to remove Sandhu as an account signatory.

A jury should consider, in light of this record, whether Kanzler knew about Sandhu's ownership interest. I would therefore reverse the district court's judgment and remand these claims for trial.

—————————————————