2023 UT App 82

# THE UTAH COURT OF APPEALS

JILL H. KENDALL AND ROBERT G. HARDING,
Appellants,
*v.*
UTAH ESTATE PLANNERS PLLC AND PATTIE S. CHRISTENSEN,
Appellees.

Opinion
No. 20210786-CA
Filed August 3, 2023

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 170400782

Steven H. Bergman, Attorney for
Appellant Jill H. Kendall

Jared W. Moss, Attorney for
Appellant Robert G. Harding

Patrick C. Burt, Attorney for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
JOHN D. LUTHY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1 Jill Kendall and Robert Harding (collectively, Trustees), acting as co-trustees of a family trust (Trust), appeal the dismissal of legal malpractice claims they filed against the Trust's former attorney. The district court dismissed the claims because Trustees failed to designate an expert witness to testify that the attorney had breached the standard of care. Trustees challenge that ruling, asserting that, for various reasons, they were not required to retain an expert witness. We disagree, and therefore affirm.

BACKGROUND[1]

¶2    In 1994, as part of a broader effort to manage his assets and plan his estate, Dean Harding created the Trust. The beneficiaries of the Trust were Dean's spouse and Dean's three children from a previous marriage (Robert, Jill, and Jeana).[2] Dean's spouse—if she survived him—was to have the use of certain Trust assets during her lifetime, and then after her death the Trust assets were to be distributed to Dean's three children "in equal shares."

¶3    Under the terms of the Trust, upon Dean's death "all property subject to [the Trust] shall be divided into two parts known as the marital share and the family share." Income from both parts of the Trust was to be paid to Dean's spouse. But Trust principal was, in the main, to pass to Dean's three children: the Trust document allowed the trustee, under certain circumstances and after making specific determinations, to distribute principal from the family share to Dean's spouse during her lifetime, but principal from the marital share was not to be distributed to Dean's spouse under any circumstance.

¶4    Dean's will—created contemporaneously with the Trust—contained a "spendthrift clause" that was apparently incorporated into the Trust. This provision mandated, in relevant part, that no "interest of any beneficiary" in the Trust "be liable . . . for the debts, contracts, liabilities, engagements, obligations or torts of such beneficiary."

---

1. A more complete description of the larger dispute underlying this case is contained in our opinion, also issued today, in *In re Harding Trust*, 2023 UT App 81.

2. Because several of the individuals involved in this case are members of the same family, we often refer to them by their first names, with no disrespect intended by the apparent informality.

¶5 Dean passed away in January 2004. When he created the Trust, Dean had named himself as trustee, and had named an accountant (Accountant) as the successor trustee. Upon Dean's death, Accountant began managing the Trust, and separated its assets into the marital and family shares. Among the assets Accountant put into the marital share of the trust were certain individual retirement accounts (the IRAs) that Dean owned prior to his death. Accountant also retained Pattie Christensen, a trusts and estates attorney working for Utah Estate Planners PLLC,[3] to "review the trust documents," "assist [Accountant] . . . with some titling," and provide help "as he requested assistance."

¶6 Not long after his appointment, Accountant resigned as trustee due to "growing contention" in the family regarding the Trust assets. Dean's spouse then appointed her son from another marriage, Rickie Taylor—who was not a Trust beneficiary—as the new trustee. Around the same time Taylor was appointed as trustee, he also obtained power of attorney over his mother's personal finances. As trustee, Taylor continued to periodically utilize Christensen's services on behalf of the Trust and would contact Christensen for legal advice approximately every two to four months, though the actual scope of Christensen's representation is disputed.

¶7 In addition to consulting with Christensen periodically, Taylor also retained the services of another attorney (Second Attorney) to assist with Trust administration. At one point, Second Attorney contacted a local law professor for guidance regarding application of the Utah Principal and Income Act (the

---

3. Pattie Christensen was the sole attorney affiliated with Utah Estate Planners during the events that give rise to this lawsuit. Because Utah Estate Planners was sued in connection with Christensen's actions, in this opinion we often refer to Utah Estate Planners and Christensen collectively as "Christensen."

UPIA)[4] to certain minimum distributions (RMDs) that she understood the Trust was required to make from the IRAs. The professor informed Second Attorney that only *income* (but not any *principal*) from the IRAs was supposed to be paid to Dean's spouse; this was contrary to what Taylor had been doing up to that point, namely, paying the entire RMDs to Dean's spouse without regard for whether those payments included some Trust principal. Second Attorney claims that she communicated this information to both Christensen and Taylor. Not long after, Second Attorney stopped working for the Trust; she testified that she made the decision to quit because Taylor, even after learning that he was not legally allowed to pay the entire RMDs to his mother, was not taking "the law seriously at all" and was "not going to stop" making the payments to his mother.

¶8 For her part, Christensen testified that she made "consistent and unwavering" statements to Taylor "not to spend principal of the marital" share of the Trust. She sent several letters—in 2005, 2006, and 2009, each either addressed directly to Taylor or copied to Taylor—that clearly indicated that Taylor was not allowed to distribute principal from the marital share, stating in one of them that the Trust "requires principal payments to come from the family share rather than the marital share." Trustees initially attempted to dispute the fact that Christensen communicated this advice to Taylor, but during oral argument on Christensen's summary judgment motion, Trustees' counsel acknowledged that Christensen had sent documents to Taylor "saying you cannot distribute principal from the marital trust." In any event, Taylor continued to distribute the full RMD amount to

---

4. In 2020, our legislature amended and renamed this statute, now titling it the "Uniform Fiduciary Income and Principal Act." *See* Utah Code § 22-3-101. No party suggests that the recent amendments are relevant to this case. In this opinion, we refer to this statute as the UPIA, the title it had during the events giving rise to this case.

his mother, without regard to whether those payments included marital share principal. Christensen did not, however, follow up with Taylor or with the Trust's financial advisers to ensure that her advice was being followed.

¶9 While Taylor was acting as trustee, Robert's ex-wife served a writ of garnishment on the Trust, seeking to collect a debt Robert apparently owed her in their divorce case. Christensen accepted service of this writ on behalf of the Trust. Ultimately, Taylor authorized payment to Robert's ex-wife, out of Trust assets, of about $250,000. The parties dispute the amount of Christensen's involvement in the decision to make the payment: Christensen claims that Taylor hired another attorney to advise him on the garnishment issue, but Taylor claims that Christensen advised him to make this payment.

¶10 Dean's spouse passed away in 2015, and Taylor was appointed as personal representative of her estate. Not long after, Robert filed a lawsuit against Taylor, the Trust, and others in which he asserted that Taylor had made improper distributions from the Trust and in which he sought a full accounting of Trust assets as well as damages. An appeal from the court's rulings in that lawsuit is the subject of our opinion in *In re Harding Trust*, 2023 UT App 81.

¶11 About two years after Robert initiated the *Harding* lawsuit, Taylor (acting as trustee of the Trust) filed this lawsuit, alleging that Christensen and Utah Estate Planners[5] had committed legal malpractice related to the advice they had given (or failed to give) to the Trust. In his complaint, as amended, Taylor acknowledged

---

5. Taylor's lawsuit also alleged malpractice against other professionals who had given advice to the Trust. All the other defendants—besides Christensen and Utah Estate Planners—were eventually dismissed from the case, and the dismissal of the other defendants is not at issue in this appeal.

that, under the UPIA and the terms of the Trust, he was supposed to distribute only about 4% of the RMDs from the IRAs to Dean's spouse, but alleged that he relied "on the advice of the various professional advisors" in distributing the entire amount. The complaint alleged that Christensen advised Taylor that he could occasionally make distributions from the marital share, that Christensen never advised Taylor about the provisions of the UPIA governing the RMDs, and that Christensen never advised Taylor that he could be subject to liability for his actions. The complaint also alleged that Christensen advised Taylor to make the writ of garnishment payment to Robert's ex-wife. The complaint did not contain any allegations of malpractice related to any conflicts of interest. And the complaint did not allege that Christensen had committed legal malpractice by failing to follow up with Taylor or the Trust to make sure her advice was followed.

¶12    As the case proceeded toward trial, Taylor moved to consolidate it with the *Harding* lawsuit. That request was denied, but the court did stay this case until the *Harding* court resolved the issue of who the proper trustee was, and then extended the stay until after the *Harding* lawsuit was fully resolved. The court in the *Harding* lawsuit removed Taylor as trustee and replaced him with Robert and Jill, who later elected to continue prosecuting this lawsuit. And the *Harding* lawsuit was eventually resolved largely in favor of Robert and against Taylor; the court in that case found that Taylor, while serving as trustee of the Trust, had breached his fiduciary duties in various ways, including by making improper distributions of Trust principal and engaging in numerous acts of self-dealing. In addition, the court found that Taylor had conflicts of interest due to his various roles as trustee of the Trust, as holder of power of attorney over his mother's finances, as a beneficiary of his mother's estate, and as personal representative of his mother's estate.

¶13    After the court in the *Harding* lawsuit made its ruling, the stay in this case was lifted. The parties stipulated to a pretrial

scheduling order that was signed by the court and included a deadline for expert disclosures. Within that deadline, Trustees submitted their expert disclosures and identified a forensic accountant to provide testimony on "the excess distributions made by the [Trust]," "the administration of the Trust," and "the administration and distribution of [Trust] assets." They did not, however, designate any expert to opine on the standard of care for a trusts and estates attorney, or to opine that Christensen had breached any such standard of care or that she had caused Trustees any damage.

¶14 After discovery was complete, Christensen moved for summary judgment, arguing that Trustees could not establish a prima facie case of legal malpractice without an expert witness who could opine on the standard of care and causation. Christensen argued that "a juror would be hard pressed to understand whether Christensen gave incorrect legal advice . . . as [Trustees] allege[d]" due to the complexity of the allegations "concern[ing] sub-trusts, minimum distributions of IRAs under" federal law and the UPIA, and "the alleged dissipation of Trust assets over many years." Trustees responded by asserting that expert testimony was not required in this case because the malpractice allegedly committed by Christensen was clear and obvious, even to a lay juror. Also, they pointed out that, because none of the parties ever filed a jury demand, this case would therefore be tried to the bench, and they argued that a different standard for necessity of expert testimony should be applied in a bench trial than in a jury trial.

¶15 After full briefing and oral argument, the district court granted Christensen's motion. The court rejected Trustees' argument that a different standard should apply in bench trials than in jury trials. And the court determined that expert testimony was necessary in this case because it calls for determination of "complex and involved allegations of malpractice" such that an attorney's standard of care is "not within the common knowledge

of the layman." Later, Trustees filed a motion asking the court to reconsider its ruling, and the court denied that motion. The court then entered final judgment in favor of Christensen.

## ISSUE AND STANDARD OF REVIEW

¶16    Trustees appeal the court's summary judgment ruling. "An appellate court reviews a district court's conclusion that expert testimony is required for correctness." *Clifford P.D. Redekop Family LLC v. Utah County Real Estate LLC*, 2016 UT App 121, ¶ 10, 378 P.3d 109. And "we review the district court's summary judgment ruling for correctness and view all facts and reasonable inferences in favor of the nonmoving party." *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 28, 235 P.3d 749 (quotation simplified).

## ANALYSIS

¶17    In legal malpractice cases, plaintiffs are often required to present expert testimony. *See Preston & Chambers, PC v. Koller*, 943 P.2d 260, 263 (Utah Ct. App. 1997) (stating that "expert testimony may be helpful, and in some cases necessary, in establishing the standard of care required in cases dealing with the duties owed by a particular profession," including "the duties owed by practicing attorneys to their clients"). In cases where expert testimony is required, a plaintiff's claims are subject to dismissal for lack of necessary evidence if that plaintiff does not present expert testimony in support of those claims. *Id.* at 264 (affirming the dismissal of legal malpractice claims that were not supported by expert testimony).

¶18    At least in cases scheduled to be tried to juries, expert testimony is required in all instances in which "the average person has little understanding of the duties owed," including in legal malpractice cases "involving complex and involved allegations of malpractice." *Id.* at 263 (quotation simplified).

Indeed, we have stated that, in the legal malpractice arena, "expert testimony is unnecessary only in cases where the defendant's conduct is within the common knowledge and experience of the layman." *Kirkham v. McConkie*, 2018 UT App 100, ¶ 8, 427 P.3d 444 (quotation simplified).

¶19 The central question presented by this appeal is whether Trustees were required—in this case that was to be tried to the bench—to support their legal malpractice claims with expert testimony. In addressing this question, we first consider whether a different standard for evaluating the necessity of expert testimony applies in legal malpractice cases that are to be tried to the bench than in similar cases scheduled for jury trials, and we conclude that the same standard applies in both types of cases. Applying that standard, we then conclude that the district court did not err in determining that Trustees were required to support their legal malpractice claims with expert testimony, or in determining that, in the absence of such support, those claims were subject to dismissal on summary judgment.

I

¶20 Trustees first assert that, in legal malpractice cases tried to the bench, a different (and more lenient) standard for evaluating the necessity of expert testimony should apply. They assert that, in *legal* malpractice cases (if not in other professional malpractice cases), the trial judge operates as a "sophisticated trier of fact" who will by definition be "experienced in the foundation of the subject matter." They contend that "[i]t would be a legal fiction to treat the bench as an average juror, and it would be superfluous to require [a legal malpractice plaintiff] to produce an expert to tell the court what it already knows."

¶21 We acknowledge Trustees' point that trial judges, by definition, have extensive and varied legal training and experience. And Trustees are correct in asserting that all the Utah

appellate opinions to have discussed the standard for evaluating the necessity of expert testimony in legal malpractice cases appear to have involved cases scheduled for jury trials. *See, e.g.*, *Kirkham*, 2018 UT App 100, ¶ 10 (evaluating whether "jurors would be hard pressed to understand" the issues in the case); *Preston & Chambers*, 943 P.2d at 263–64. Certainly, no Utah appellate court has yet considered whether a different standard should apply in cases scheduled to be tried to the bench.

¶22 But courts in other jurisdictions have considered this issue, and they have generally declined the invitation to apply a different standard in bench trials than in jury trials. In so doing, these courts have offered several persuasive reasons not to apply different standards in different types of cases. First, judges acting as factfinders in bench trials are not supposed to use their background knowledge in resolving factual questions. *See Landeen v. Phonebillit, Inc.*, No. 1:04-CV-1815LJM-WTL, 2007 WL 4556739, at *1 (S.D. Ind. Dec. 20, 2007) ("[A] judge may not decide lawsuits based on their independent knowledge of facts."). Instead, factfinders—including judges presiding over bench trials—are expected to consider only the evidence admitted in court. If judges acting as factfinders were to rely on their own "unique expertise" in determining the appropriate standard of care in a legal malpractice case, *see Royal Ins. Co. of Am. v. Miles & Stockbridge, PC*, 138 F. Supp. 2d 695, 700 (D. Md.), *amended in part on other grounds*, 142 F. Supp. 2d 676 (D. Md. 2001), they would be forced to violate this convention and "use [their] own independent knowledge" in deciding the case, *see Sheetz v. Morgan*, 424 N.E.2d 867, 871 (Ill. App. Ct. 1981); *see also Landeen*, 2007 WL 4556739, at *1 ("[I]f expert testimony is required to establish the standard of care for [the plaintiff]'s malpractice case . . . , then the Court cannot act as its own expert because it would require the Court to consider facts not in evidence.").

¶23 Moreover, a standard that allows a judge to effectively act as a standard-of-care expert in a legal malpractice case would

infringe on the parties' right to meaningfully test an expert's assumptions, beliefs, and background. To explore these things, a litigant is normally afforded the opportunity to cross-examine an expert witness retained by the other side; no such process is available if the judge fulfills the "expert" role.[6] *See Cleckner v. Dale*, 719 S.W.2d 535, 542 (Tenn. Ct. App. 1986) ("If the trial court's opinion [on the standard of professional conduct in a legal malpractice case] is based upon its personal experience, its evidentiary foundation will not be before the jury and will not be subject to cross examination by counsel."), *abrogated on other grounds by Chapman v. Bearfield*, 207 S.W.3d 736 (Tenn. 2006); *Primis Corp. v. Milledge*, No. 14-08-00753-CV, 2010 WL 2103936, at *3 n.1 (Tex. App. May 27, 2010) ("A trial judge's private thoughts regarding [whether attorneys breached their duties] are not evidence, and they are not reflected in the record. Nor are they subjected to the adversarial process."). And the standard of care itself is a factual issue that should be resolved subject to the usual adversarial process. *See Lentino v. Fringe Emp. Plans, Inc.*, 611 F.2d 474, 481 (3d Cir. 1979) ("[T]he actual standard of care itself is a

---

6. Indeed, allowing a trial judge to effectively fulfill the role of standard-of-care expert may present due process problems. *See Bonhiver v. Rotenberg, Schwartzman & Richards*, 461 F.2d 925, 928–29 (7th Cir. 1972) ("A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by [cross-examination], or any of the rules of evidence constitutes a denial of due process of law." (quotation simplified)); *see also Fishow v. Simpson*, 462 A.2d 540, 544 (Md. Ct. Spec. App. 1983); *Landeen v. Phonebillit, Inc.*, No. 1:04-CV-1815LJM-WTL, 2007 WL 4556739, at *1 (S.D. Ind. Dec. 20, 2007). In this opinion, we do not go so far as to actually hold that applying a different standard in legal malpractice cases tried to the bench would violate due process, but we view the due process considerations here as legitimate and serious enough to contribute to dissuading us from adopting a standard that would potentially infringe on a litigant's rights.

question of fact that is best left to the presentation of evidence with the opportunity for cross-examination and rebuttal."); *Primis Corp.*, 2010 WL 2103936, at *3 n.1 ("[A]lthough a trial judge may be competent to evaluate whether an attorney breached a duty to his client and whether this breach caused damage, these are factual issues that must be established in the evidence at trial and subjected to the adversary process.").

¶24 Next, while trial judges are all very experienced, that experience takes different forms with each individual judge. Some judges come from a criminal law background. Others come from a civil law background. And some come from unique backgrounds that cannot fairly be categorized as traditionally "civil" or traditionally "criminal." In addition, the term "civil law" encompasses so many specialties and subspecialties that a judge whose background is in one area of the civil law may not come to the bench with significant knowledge about another area of the civil law. It is therefore fair to say that "not every trial judge is an expert in the particular field of practice at issue" in a given legal malpractice case. *See D'Agostino v. Drazin & Warshaw, PC*, No. A-1470-11T3, 2013 WL 4859575, at *6 (N.J. Super. Ct. App. Div. Sept. 13, 2013); *see also Cleckner*, 719 S.W.2d at 542 ("No attorney is bound to know all the law, God forbid that it should be imagined that an attorney, or a counsel, or even a judge is bound to know all the law." (quoting *Montriou v. Jefferys* (1825) 172 Eng. Rep. 51, 53)). These differences in experience among judges lead to practical difficulties in attempting to articulate and apply a bench-trial-based standard regarding the necessity of expert testimony in legal malpractice cases. The normal jury-trial-based standard, articulated above, is whether the issues presented are "within the common knowledge and experience of the layman." *See Kirkham*, 2018 UT App 100, ¶ 8 (quotation simplified). If we were to apply a different standard in cases tried to the bench, would we apply an objective standard—asking whether the issues are within the common knowledge of a hypothetical ordinary and reasonable trial judge—or would we

apply a subjective standard—asking whether the issues are within the common knowledge of the particular judge who happens to be assigned to the case in question? Both approaches present practical problems.

¶25    Use of an objective standard would "require reviewing courts to determine whether the trial judge possessed the knowledge of some theoretical ordinary judge, a creature far more difficult to define than an ordinary person." *Lentino*, 611 F.2d at 481 n.12. And it would not account for a situation where, for whatever reason, the judge assigned to the case is less familiar with the law in a particular field than other more experienced judges might be. *See Cleckner*, 719 S.W.2d at 542 ("A trial judge, solely by virtue of the office, does not possess sufficient familiarity with all legal endeavors to enable the judge to testify authoritatively concerning the proper standard of conduct for each case."). And use of a subjective standard would "require appellate courts to undertake the unwanted task of evaluating the trial judge's personal knowledge." *Lentino*, 611 F.2d at 481.

¶26    Finally, adopting the approach Trustees advocate would create divergent standards for bench and jury trials, which we do not believe is necessary, and would create uncertainty within the law. *See id.* ("[I]n the interest of uniformity, we prefer not to unnecessarily establish a different substantive requirement for bench trials than for jury trials.").

¶27    We acknowledge that, in some jurisdictions, exceptions have been made in legal malpractice cases where the alleged malpractice involved straightforward violations of procedural rules of court practice, a subject matter presumably within the ken of all trial judges. *See Dixon v. Bromson & Reiner*, 898 A.2d 193, 196 (Conn. App. Ct. 2006) (recognizing an exception in cases tried to the bench in which "the alleged legal malpractice involved a failure to follow rules of procedure, such as filing motions and attending hearings"); *cf. Zick v. Krob*, 872 P.2d 1290, 1294 (Colo.

App. 1993) (stating that, where "the proffered testimony concerned matters of legal practice, the trial court was in a particularly appropriate position to assess whether such testimony would be helpful in its deliberations" and therefore the trial court did not abuse its discretion in excluding the testimony and relying on its own expertise). But even assuming, without deciding, that Utah law would allow for such an exception, no such exception would apply in this case because (as discussed more fully below) the allegations of legal malpractice at issue do not involve violations of court rules of practice.[7]

---

7. Part of Trustees' claims involve allegations that Christensen violated ethical rules concerning attorney conflict of interest requirements. *See* Utah R. Pro. Conduct 1.7. But we have our doubts that rules governing attorney conflicts of interest are the sort of "rules of procedure, such as filing motions and attending hearings," that have in some states triggered an exception to the expert requirement in legal malpractice cases tried to the bench. *See Dixon v. Bromson & Reiner*, 898 A.2d 193, 196 (Conn. App. Ct. 2006). Court rules regarding "filing motions and attending hearings" are necessarily within the knowledge of every trial judge. But rules governing attorney conflicts of interest—whose nuances are often quite complex—might not be. *See, e.g., NanoLogix, Inc. v. Novak*, No. 4:13-CV-1000, 2016 WL 1170776, at *10 (N.D. Ohio Mar. 25, 2016) (holding that whether an attorney "had a potential or actual conflict of interest . . . is a complex issue involving the rules of professional conduct" and "is not within the understanding of laymen"). And in any event, Utah law is clear that "violations of the Rules of Professional Conduct" do not necessarily "give rise to a cause of action for legal malpractice." *See Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1291 n.3 (Utah Ct. App.), *cert. denied*, 919 P.2d 1208 (Utah 1996); *see also Archuleta v. Hughes*, 969 P.2d 409, 414 (Utah 1998) ("The Utah Rules of Professional Conduct are not designed to create a basis for civil liability.").

¶28    In sum, for the reasons here discussed, in our view it would be imprudent to adopt a different standard for evaluation of the necessity of expert testimony in legal malpractice cases tried to the bench than in similar cases tried to juries. We therefore agree with the other jurisdictions to have considered the issue, and conclude that the same standard regarding necessity of expert testimony should generally apply in all legal malpractice cases, without regard to whether those cases are tried to the bench or to a jury.

II

¶29    Trustees next assert that, even under the usual standard applied in jury cases, the district court erred in concluding that expert testimony was necessary to support Trustees' legal malpractice claims against Christensen, and therefore erred in dismissing Trustees' claims for failure of proof. We discern no error in the district court's conclusions.

¶30    As noted above, expert testimony is required in cases "where the average person has little understanding of the duties owed by particular trades or professions, including duties owed by practicing attorneys to their clients, especially in cases involving complex and involved allegations of malpractice." *Kirkham v. McConkie*, 2018 UT App 100, ¶ 8, 427 P.3d 444 (quotation simplified). "Expert testimony is unnecessary only in cases where the defendant's conduct is within the common knowledge and experience of the layman" or, in other words, where "an average bystander would be able to provide the same testimony." *Id.* (quotation simplified).

¶31    For example, in *Kirkham*, a plaintiff alleged that his former attorneys had committed malpractice by failing to respond to a petition to modify child support by filing a counterpetition seeking a different modification of child support in favor of their client. *Id.* ¶ 2. When the plaintiff did not designate an expert witness in support of the legal malpractice claim, the former

attorneys moved for summary judgment, which the trial court granted. *Id.* ¶ 4. On appeal, we affirmed the trial court's rulings, concluding that "the average juror would not know whether an attorney with ordinary skill and capacity would have filed a counterpetition under the same circumstances of this case." *Id.* ¶ 10. We noted that, "without the help of an expert, jurors would be hard pressed to understand how the Utah Rules of Civil Procedure and the Utah Child Support Act operate together and whether an attorney would have been expected to file a counterpetition" under the circumstances presented. *Id.* (quotation simplified). And we stated that "these issues require a level of expertise in the field of family law, and an expert was therefore necessary to aid the jury in identifying the attorney standard of care for filing petitions to modify child support." *Id.*; *see also Preston & Chambers, PC v. Koller*, 943 P.2d 260, 264 (Utah Ct. App. 1997) (affirming a court's dismissal of a legal malpractice claim for lack of expert testimony where the "allegations included claims concerning water rights, eminent domain, and negligent services," and agreeing with the trial court's statement that "to suggest that the claims are so obvious that no attorney or expertise would be necessary is . . . not credible").

¶32 Trustees are, however, correct in asserting that expert testimony is not always required in legal malpractice cases. If an attorney's error is obvious, even to a layperson, a plaintiff is entitled to present the case to the factfinder even without the assistance of a legal expert witness. *See Kirkham*, 2018 UT App 100, ¶ 8. In malpractice cases involving other professionals, such as medical doctors, Utah courts have applied this exception, holding that expert testimony was not required to establish the standard of care in a medical malpractice case in which a surgeon lost a "curved cutting needle[]" inside a patient, reasoning that it "is within the common knowledge and experience of the layman" that such conduct fell below the appropriate standard of care. *Nixdorf v. Hicken*, 612 P.2d 348, 351–52 (Utah 1980).

¶33 In legal malpractice cases involving attorney mistakes analogous to a surgeon leaving a needle inside a patient, a plaintiff will not be required to present expert testimony in order to establish a breach of the standard of care. At oral argument before this court, Christensen's attorney provided an example of one situation in which an attorney's malpractice would be obvious even to a layperson: when an attorney steals money from a client. And we can certainly envision other similar examples. *See, e.g.*, *Sandhu v. Kanzler*, 932 F.3d 1107, 1116 (8th Cir. 2019) (stating that legal malpractice claims "premised on straightforward acts or omissions such as an obviously missed deadline or a clear case of stealing client funds" would not need to be supported by expert testimony (quotation simplified)); *Boyle v. Welsh*, 589 N.W.2d 118, 127 (Neb. 1999) (stating that "failure to file a suit that should otherwise be filed within the time required by the statute of limitations is a deviation from the standard of care falling within the common knowledge exception," but holding that the exception did not apply if there existed a legitimate question about whether the case should have been filed at all against the particular defendant in question); *cf. Reperex, Inc. v. Coldwell Banker Com.*, 2018 UT 51, ¶¶ 38, 40, 428 P.3d 1082 (holding, in a breach of fiduciary duty case not involving alleged attorney malpractice, that a broker who "misrepresent[ed] material information to a buyer" had breached fiduciary duties in a manner "within the common understanding of a lay person").

¶34 Trustees assert that the malpractice they allege against Christensen falls into the "obvious" category, and that any layperson should be able to tell, even without the assistance of a legal expert, that Christensen violated professional standards of care. While we acknowledge that, at some level, resolution of this inquiry depends on how the malpractice allegations are framed, we disagree with Trustees' contention that the attorney mistakes they allege are, under these circumstances, so clear as to be obvious to any layperson.

¶35 In an effort to make their malpractice allegations seem as obvious as possible, Trustees characterize Christensen's alleged mistakes as follows: they say Christensen should have "(1) communicated advice to Taylor on the proper . . . allocation of RMDs or made sure Taylor applied that advice; (2) ensured that Taylor followed [Christensen's] determinations on the proscription against distributing principal to the prior beneficiary of [the Trust]; (3) followed the spendthrift provisions of the [w]ill and [the] Trust and Utah law; and (4) not engaged in obvious conflicts of interest." But even so characterized, these allegations of attorney wrongdoing, viewed in context, are not so clear as to be obvious to a layperson.

¶36 To determine how "an attorney with ordinary skill and capacity" should have acted "under the same circumstances of this case," *Kirkham*, 2018 UT App 100, ¶ 10, the factfinder must be able to understand several interrelated aspects of the many requirements governing attorney conduct. For instance, the factfinder must be able to understand how the terms of the Trust governing distributions of principal and income interact with the requirements of the UPIA. In addition, the factfinder must know whether and to what extent attorneys are obligated to follow up with clients to make sure previously given advice is being followed. And the factfinder must understand the ethical rules and standards that govern potential conflicts of interest. In our view, these areas of knowledge and understanding are not only well outside the "common knowledge and experience of the layman," *see id.* ¶ 8 (quotation simplified), but they are outside the common knowledge and experience of many attorneys and judges. In this case, Christensen has done far "more than gesture vaguely at the complexity of the transaction" in question. *See Reperex*, 2018 UT 51, ¶ 43. Rather, Christensen has persuaded us, like the district court, that the malpractice allegations here are outside the ordinary understanding of a layperson, and that

expert testimony would not only have been helpful,[8] but was required, to illuminate and support Trustees' claims. This is simply not a case in which "an average bystander would [have been] able to provide the same testimony" as an expert retained to discuss the professional duties owed by a trusts and estates lawyer and, specifically, to opine on whether Christensen had breached those duties and caused damages. *See Kirkham*, 2018 UT App 100, ¶ 8 (quotation simplified). And given this conclusion, it follows that the district court did not err by dismissing Trustees' legal malpractice claims for failure of proof.[9]

---

8. The district court, in its ruling, stated that "expert testimony" regarding whether Christensen had breached the standard of care "would help the trier of fact." Trustees assert—correctly—that, in this context, it is "not enough" for the district court to conclude that expert testimony would be "helpful." Helpfulness is a necessary element of admissibility of expert testimony. *See* Utah R. Evid. 702(a). But just because expert testimony is admissible does not mean that it is required. As we read the record, however, the district court understood this distinction; we read the court's allusion to "helpfulness" as simply an indication that the attorney malpractice alleged by Trustees was not necessarily within the district court's own set of knowledge, and therefore definitely not within the ken of a typical lay person.

9. Trustees also assert that the district court, by determining that Trustees' malpractice allegations were complex and not within the knowledge of a lay juror, made a factual determination that should have been reserved for the factfinder after trial. This is incorrect. The question of whether the allegations are complex (or, alternatively, present obvious issues within a lay juror's knowledge) is a threshold question that must be decided by the court as a matter of law. The district court was required to engage with the question in order to decide Christensen's motion for summary judgment, and did not err by doing so.

CONCLUSION

¶37 The district court applied the correct standard for evaluating whether Trustees needed expert testimony to support their legal malpractice claims. And in applying that standard, the court did not err by concluding that expert testimony was indeed required. Accordingly, we affirm the district court's summary judgment order dismissing Trustees' legal malpractice claims.

———————